**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| JACQUELINE EVERSON, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| vs. | ) | |
| | ) | **Case No. 1:23-cv-02947** |
| THE COCA-COLA COMPANY, | ) | |
| | ) | |
| LIBERTY MUTUAL INSURANCE | ) | |
| COMPANY, | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION TO DISMISS PLAINTIFF'S COMPLAINT**</u>

Pursuant to Rules 12(b)(6) and 12(f) of the Federal Rules of Civil Procedure, Defendant Liberty Mutual Insurance Company ("Liberty Mutual") submits this Memorandum of Law in Support of its Motion to Dismiss Plaintiff's Complaint. Specifically, Liberty Mutual seeks dismissal of the Complaint for five reasons: 1) Plaintiff's state law causes of action in the Complaint pertaining to Plaintiff's claim for benefits are preempted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, et seq., as amended ("ERISA"); 2) Liberty Mutual Insurance Company did not issue the Group Disability Income Policy that is referenced in Plaintiff's Complaint and was not involved in the administration of Plaintiff's 2004 claim for benefits from that Policy, and thus, is not the proper

defendant in this action; 3) the Complaint does not assert a cognizable claim under the Americans with Disabilities Act, 42 U.S.C. § 12101 et. seq., as amended ("ADA"); 4) Plaintiff's claims in the Complaint all pertain to Plaintiff's claim for benefits from the Policy and are the subject of Plaintiff's previous lawsuit filed on September 21, 2005, against Liberty Mutual Assurance Company; and thus, are barred by the doctrines of res judicata and/or collateral estoppel; and 5) Plaintiff's claims in the Complaint were not brought within the applicable statute of limitations. Accordingly, the allegations pled in the Complaint in support of Plaintiff's claims, even if taken as true,[1] are insufficient to support the relief requested by Plaintiff.

## I.
## ALLEGATIONS IN THE COMPLAINT

In the Complaint, Plaintiff brings a claim pursuant to the ADA and seeks recovery under causes of action for disability discrimination and disparate treatment, presumably under 42 U.S.C. § 12112 (Complaint, ¶ 8, Counts I-IV, and ¶ 7 of Count V of the Complaint), along with state law causes of action under O.C.G.A Sections 16-14-9 (remedies). 11-2-721 (fraud), and 13-6-11 (bad faith/litigious conduct) (Complaint, Counts V, VI, and VII). Plaintiff's claims and causes of action all stem from her allegation that she has been deemed disabled for

---

[1] For the purposes of the Motion to Partially Dismiss, the Court must assume the facts alleged by Plaintiff in the Complaint to be true. However, Liberty Mutual does not admit the truthfulness or accuracy of any factual allegation contained in the Complaint by filing its Motion and Memorandum or by any statement contained therein.

the purposes of receiving early retirement benefits from The Coca-Cola Company's Pension Plan ("Pension Plan") but not deemed disabled under any other benefit plan or for any other purpose connected to her previous employment with The Coca-Cola Company ("Coca Cola") (Complaint, ¶ 8).

While the basis for any claim or cause of action against Liberty Mutual is unclear, the Complaint appears to seek relief based on Liberty Mutual's administration of Plaintiff's claim for benefits from The Coca-Cola Company Long Term Disability Benefit Plan ("LTD Plan") under the Group Disability Income Policy GF-850-281390-01 (the "LTD Policy) that was issued by Liberty Life Assurance Company of Boston ("Liberty Life") to Coca-Cola to insure benefits from the LTD Plan.

The only conduct of Liberty Mutual about which Plaintiff alleges constitutes "discrimination" in the Complaint pertains to Liberty Mutual's administration and denial of Plaintiff's claim for benefits from the LTD Plan under the LTD Policy (Complaint ¶ 8).  Plaintiff makes reference in the Complaint to a March 29, 2005, letter in which it states, "you are no longer considered disabled from your own occupation per the Coca-Cola Company policy" (Complaint ¶ 8), which directly refers to Plaintiff's claim for benefits from the LTD Plan under the LTD Policy. Therefore, it is clear that the Court must refer to the LTD Policy and the March 29, 2005, letter in assessing Plaintiff's ADA causes of action and her state law causes

of action.  Accordingly, true and correct copies of the LTD Policy (Exhibit A) and the March 29, 2005, letter from Liberty Life to Plaintiff (Exhibit B) are attached to Liberty Mutual's Motion to Dismiss Plaintiff's Complaint and incorporated herein by reference.

Additionally, Liberty Life's denial of Plaintiff's claim for benefits was the subject of an action filed by Plaintiff on September 21, 2005, in the United States District Court for the Northern District of Georgia, Atlanta Division, styled *Jacqueline Everson v. Liberty Mutual Assurance Company*, CA 1:05-cv-02459 (the "2005 Action").  The Docket Sheet (Exhibit C), Plaintiff's Original Complaint (Exhibit D; 2005 Action Document 1), Findings of Fact and Conclusions of Law (Exhibit E; 2005 Action Document 77), Judgment (Exhibit F; 2005 Action Document 78), Dismissal of Appeal by the Eleventh Circuit (Exhibit G; 2005 Action Document 88), and U.S. Supreme Court's Denial of Certiorari (Exhibit H; 2005 Action Document 89) filed in the 2005 Action are all attached as Exhibits as noted above to Liberty Mutual's Motion to Dismiss Plaintiff's Complaint and are incorporated herein by reference.

## II.
## ARGUMENT AND AUTHORITIES

A.    STANDARD GOVERNING RULE 12(B)(6) MOTION TO DISMISS

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a Complaint for failure to state a claim upon which relief can be granted.[2] Plaintiff must state a facially plausible claim for relief in her Complaint. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Wooten v. Quicken Loans, Inc.*, 626 F.3d 1187, 1196 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)). "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" does not suffice. *Ashcroft*, 556 U.S. at 678 (internal quotations omitted). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. (citation omitted). While a court must accept all factual allegations in a complaint as true, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient. *Id*. (internal citation omitted). In addition, "if as a matter of law, it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations, a claim must be dismissed, without regard to whether it is based on an

---

[2]    Fed. R. Civ. P. 12(b)(6).

5

outlandish legal theory or on a close but ultimately unavailing one. *Neitzke v. Williams*, 490 U.S. 319, 326, 109 S. Ct. 1827, 104 L. Ed. 2d 338 (1989) (citation omitted).

As described above, the Complaint specifically references both the LTD Policy and the March 29, 2005, letter (Complaint, ¶ 8 and item number 2 under Count IV "Evidence"), and Plaintiff's claims are predicated on those documents. Under the federal rules, it is widely recognized that when a plaintiff references, but does not attach, certain documents to the complaint that are central to the plaintiff's claim, the Court may consider the documents for purposes of a Rule 12(b)(6) motion to dismiss without conversion to summary judgment under Rule 56. *Baker v. City of Madison*, 67 F.4th 1268, 1277 (11th Cir. 2023); *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2022)*; Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F. 3d 1364, 1369 (11th Cir. 1997). Accordingly, the LTD Policy (Exhibit A) and the March 29, 2004, letter (Exhibit B) are attached to Liberty Mutual's Motion to Dismiss for the Court's consideration in ruling on this Motion.

Additionally, a Court may take judicial notice of public records, including court documents, in considering a motion to dismiss, without converting the motion into a motion for summary judgment. *McCone v. Thorpe*, 828 F. App'x 697, 698 (11th Cir. 2020) (copy attached). Accordingly, documents filed in the

6

2005 Action are attached to Liberty Mutual's Motion to Dismiss as Exhibit C-H for the Court's consideration in ruling on this Motion.

> **B.    PLAINTIFF'S STATE LAW CAUSES OF ACTION ARE PREEMPTED BY ERISA**

As this Court is aware, the preemptive force of ERISA is so powerful that the Supreme Court has specifically held that it completely displaces any state law cause of action. *Metropolitan Life Ins. Co. v. Taylor*, 481 U.S. 58, 64 (1987).

It is evident from the Plaintiff's Complaint and from the LTD Policy that the disability plan at issue is an ERISA plan in which Plaintiff was eligible to participate through her employment with Coca-Cola.[3]  Further, the only conduct of Liberty Mutual about which Plaintiff complains in the Complaint is Liberty Mutual's administration and denial of Plaintiff's claim for benefits from the LTD Plan under the LTD Policy.  (Complaint ¶ 8)  Therefore, it is clear that the Court must refer to the LTD Policy in assessing Plaintiff's state law causes of action. Accordingly, Plaintiff's causes of action directly "relate to" the disability plan and are preempted.  *Jones v. LMR Int'l, Inc.*, 457 F.3d 1174, 1179 (11th Cir. 2006). Indeed, both the Supreme Court and the Eleventh Circuit have held that ERISA preempts the state law causes of action asserted by Plaintiff.  See, e.g., *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 47-48 (1987) (breach of contract and fraud

---

[3]    See Complaint, ¶¶ 7 and 8; Policy (Exhibit "A"); Plaintiff's allegations in the Complaint and the LTD Policy clearly establish that the disability benefits sought by Plaintiff are sought from a benefit plan "established or maintained by an employer . . . for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, . . ." 29 U.S.C. § 1002(1).

causes of action preempted in disability benefits context); *Sanson v. General Motors Corp.*, 966 F.2d 618, 621 (11th Cir. 1992) (ERISA preempted a fraudulent representation claim).

Additionally, as reflected by the Complaint, Plaintiff's state law causes of action are in the nature of a complaint "asserting improper processing of a claim for benefits under an ERISA-regulated plan" and this cause of action is clearly preempted by ERISA. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 55-56 (1987) ("all suits brought by beneficiaries asserting improper processing of claims under ERISA-regulated plans [will] be treated as federal questions governed by [ERISA's civil enforcement mechanisms].")  ERISA regulates employee benefit plans that "through the purchase of insurance or otherwise," provide medical, surgical, or hospital care, or benefits in the event of sickness, accident, disability, or death." Pilot Life Ins. Co.*,* 481 U.S. at 44.  Accordingly, all of Plaintiff's state law causes of action in the Complaint are clearly preempted by ERISA, and the Court must dismiss those claims.

## C.    LIBERTY MUTUAL IS NOT A PROPER DEFENDANT

Plaintiff asserts that Coca-Cola "hired" Liberty Mutual, and Liberty Mutual made decisions on her claim for benefits from the LTD Plan under the LTD Policy. (Complaint ¶ 11, Count III).  However, as reflected by the terms of the LTD Policy itself, the issuer of the LTD Policy and the decision maker on Plaintiff's claim for

disability benefits is Liberty Life (Exhibit A, p.1) and not Liberty Mutual, which is a wholly separate entity. Moreover, the address on the March 29, 2005, letter (Exhibit B) that Plaintiff references in the Complaint reflects that the letter was from Liberty Life, not Liberty Mutual. As the Complaint fails to state any claim against Liberty Mutual upon which relief may be granted (because it is not the issuer of the Policy and was not the decision maker on Plaintiff's claims), Liberty Mutual should be dismissed from this action.

D.   **PLAINTIFF DOES NOT RAISE A COGNIZABLE CLAIM OF DISCRIMINATION AGAINST LIBERTY MUTUAL UNDER THE ADA**

Only a "covered entity," as defined by the ADA (42 U.S.C. §12111(2)) can be liable to Plaintiff for discrimination under 42 U.S.C. §12112(a). Section 12111(2) defines a "covered entity" as "an employer, employment agency, labor organization, or joint labor-management committee." Plaintiff does not assert that Liberty Mutual was her employer for any purpose, nor does Plaintiff assert that Liberty Mutual is an employment agency, labor organization, or joint labor-management committee. Accordingly, Liberty Mutual was not a "covered entity" under the ADA for the purposes of Plaintiff's claims in the Complaint, and Plaintiff's claims against Liberty Mutual pursuant to 42 U.S.C. §12112 must be dismissed.

Additionally, a timely filing of a Charge of Discrimination with either the EEOC or the corresponding State Agency is required prior to filing a suit under 42

U.S.C. §12112.  "Timely filing a charge of discrimination is a prerequisite to bringing suit under both Title VII and the ADA." *Maynard v. Pneumatic Prods. Corp*. 256 F.3d 1259 (11th Cir. 2001).  (citing, Section 706(e) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 (e) (1994); 42 U.S.C. § 12117 (a); *Love v. Pullman*, 404 U.S. 522, 523, 30 L. Ed. 2d 679, 92 S. Ct. 616 (1972)). Plaintiff does not assert in the Complaint that she has filed such a Charge. Accordingly, her claim for discrimination pursuant to 42 U.S.C. §12112 must be dismissed.

**E.    PLAINTIFF'S CLAIMS ARE ALL BARRED BY THE DOCTRINES OF RES JUDICATA AND/OR COLLATERAL ESTOPPEL**

Plaintiff's claims against Liberty Mutual are all based upon the denial of her claim for benefits from the LTD Plan under the LTD Policy (Complaint, ¶ 8). Additionally, Plaintiff filed the 2005 Action to challenge that denial and to seek recovery of disability benefits from the LTD Plan under the LTD Policy (Exhibit D).  The Court conducted a bench trial in the 2005 Action on December 16, 2008, and entered Findings of Fact and Conclusions of Law on January 2, 2009 (Exhibit E) that concluded "Liberty's decision to terminate Plaintiff's benefits was not arbitrary and capricious" and directed the Clerk to enter judgment in favor of Defendant and against Plaintiff.  Judgment was entered on January 2, 2009 (Exhibit F).  Plaintiff appealed the Judgment, but her appeal was dismissed by the

Eleventh Circuit on March 19, 2009 (Exhibit G), and the United States Supreme Court denied certiorari (Exhibit H).

"Res judicata is a judicially crafted doctrine, created to provide finality and conserve resources." *Maldonado v. U.S. Att'y Gen.*, 664 F.3d 1369, 1375 (11th Cir. 2011). "Res judicata, or claim preclusion, will prohibit a party from relitigating a claim where a judgment on the merits (involving the same claim and the same parties) exists from a prior action." *Adams v. S. Farm Bureau Life Ins. Co.*, 493 F.3d 1276, 1289 (11th Cir. 2007). "[A] claim is precluded by the judgment in a prior case when (1) the prior judgment was rendered by a court of competent jurisdiction; (2) the judgment was final and on the merits; (3) both cases involve the same parties or those in privity with them; and (4) 'both cases . . . involve the same causes of action.'" *Borrero v. United Healthcare of N.Y., Inc.*, 610 F.3d 1296, 1306 (11th Cir. 2010) (quoting *In re Piper Aircraft Corp.*, 244 F.3d 1289, 1296 (11th Cir. 2001)).

The 2005 Action was bought by Plaintiff, a final judgment was reached, and Plaintiff's appeal was dismissed. The adjudication of Plaintiff's claim for benefits and the finding by the Court that the decision to deny further benefits was not arbitrary and capricious precludes Plaintiff from again litigating these issues. Accordingly, Plaintiff's claims and causes of action must be dismissed.

11

**F.**    **PLAINTIFF FAILED TO FILE THIS LAWSUIT WITHIN THE APPLICABLE STATUTE OF LIMITATIONS**

The specific conduct of Liberty Mutual about which Plaintiff complains occurred in 2005, when her claim for benefits from the LTD Plan under the LTD Policy was denied (Exhibit B).   While Plaintiff asserts that there is "newly acquired" evidence, such evidence only pertains to Coca-Cola and her communications with Coca-Cola pertaining to her disability status (Complaint, ¶ 8).

Because Title III of the ADA does not contain a statute of limitations, claims under each Act are "governed by the most analogous state statute of limitations." *Hunt v. Ga. Dep't of Comm. Affs.*, 490 F. App'x 196, 197 (11th Cir. 2012) (citing *Everett v. Cobb Cnty. Sch. Dist.*, 138 F.3d 1407, 1409-10 (11th Cir. 1998)) (copy attached).  O.C.G.A. § 9-3-33, which prescribes a two-year limitations period has been held to be the most analogous statute of limitations and will govern Plaintiff's claims.  *Kennedy v. South Univ.*, CA 4:21-cv-172, 2022 U.S. Dist. Lexis 37756 (S.D. Ga, March 3, 2022) (copy attached).  ERISA claims must be brought in Georgia within the six-year statute of limitations prescribed by O.C.G.A. § 9-3-24, unless the relevant plan document provides for a reasonable shorter period of time. *Northlake Regional Medical Center v. Waffle House Sys, Employee Benefit Plan*, 160 F.3d 1301, 1303 (11th Cir. 1998).  The LTD Policy limitations period is one year from when proof of claim was required (Exhibit A; Legal Proceedings).  As

any interaction between Plaintiff and the entity that made decisions on her claim ended with the entry of the October 2009 denial of certiorari in the 2005 Action, any and all applicable statutes of limitation on Plaintiff's claims had long expired before Plaintiff filed her Complaint in this action on July 3, 2023. Accordingly, Plaintiff's claims and causes of action must be dismissed.

## III.
## REQUEST FOR RELIEF

Liberty Mutual requests the Court dismiss Plaintiff's Original Complaint against it with prejudice, award Liberty Mutual its attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g); and grant Liberty Mutual any other relief to which it shows itself justly entitled.

Respectfully submitted,

DREW ECKL & FARNHAM, LLP

/s/ Brian Johnson
Brian Johnson, Esq.
Georgia Bar No. 394745

Drew, Eckl & Farnham, LLP
880 W. Peachtree Street
Atlanta, Georgia 30357
404/885-1400
404/876-0992 fax
Email:  johnsonb@deflaw.com

AND

s/ Iwana Rademaekers
Iwana Rademaekers, Esq.
Texas Bar No. 16452560
(*Pro Hac Vice* Application pending)

LAW OFFICES OF IWANA RADEMAEKERS, P.C.
17304 Preston Road, Suite 800
Dallas, Texas 75252
Main:  (214) 579-9319
Fax:  (469) 444-6456
Email:  iwana@rademaekerslaw.com

**14**

## LOCAL RULE 5.1C and 7.1D CERTIFICATION

Pursuant to Local Rule 5.1C and 7.1D, I certify that this pleading has been prepared with Times New Roman 14 Point, the font and point selections approved by this Court in Local Rule 5.1C.

## CERTIFICATE OF SERVICE

I hereby certify that on July 31, 2023, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system.

I further certify that a true and correct copy of the foregoing has been sent via US Priority Mail to the following non-CM/ECF case participants:

> Jacqueline Everson
> 1530 Locust Log Way
> Austell, GA 30168
> Pro Se Plaintiff

> Respectfully submitted,

> DREW, ECKL & FARNHAM

> s/ *Brian Johnson*
> Brian Johnson, Esq.
> Georgia Bar No. 394745

**15**

# GROUP DISABILITY INCOME POLICY

**Sponsor:**          **The Coca-Cola Company**

**Policy Number:**   GF3-850-281390-01

**Effective Date:**   **January 1, 2003**

**Governing Jurisdiction** is **Georgia** and subject to the laws of that State.

**Premiums** are due and payable monthly on the first day of each month.

**Policy Anniversaries** shall occur each January 1st beginning in 2004.

Liberty Life Assurance Company of Boston (hereinafter referred to as Liberty) agrees to pay the benefits provided by this policy in accordance with its provisions. This policy provides Long Term Disability coverage.

**PLEASE READ THIS POLICY CAREFULLY FOR FULL DETAILS.**

This policy is a legal contract and is issued in consideration of the Application of the Sponsor, a copy of which is attached, and of the payment of premiums by the Sponsor.

For purposes of this policy, the Sponsor acts on its own behalf or as the Covered Person's agent. Under no circumstances will the Sponsor be deemed the agent of Liberty.

This policy is delivered in and governed by the laws of the governing jurisdiction except to the extent preempted by The Employee Retirement Income Security Act of 1974 (ERISA) and any subsequent amendments.

The following pages including any amendments, riders or endorsements are a part of this policy.

Signed at Liberty's Home Office, 175 Berkeley Street, Boston, Massachusetts, 02117.

**"NOTICE:**     **The laws of the State of Georgia prohibit insurers from unfairly discriminating against any person based upon his or her status as a victim of family violence".**

**NON-PARTICIPATING**

**Form ADOP.5**

EXHIBIT

____A____

# TABLE OF CONTENTS

**SECTION 1**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **SCHEDULE OF BENEFITS**

**SECTION 2**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **DEFINITIONS**

**SECTION 3**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **ELIGIBILITY AND EFFECTIVE DATES**

**SECTION 4**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **DISABILITY INCOME BENEFITS**

**SECTION 5**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **EXCLUSIONS**

**SECTION 6**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **TERMINATION PROVISIONS**

**SECTION 7**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **GENERAL PROVISIONS**

**SECTION 8**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **PREMIUMS**

**SECTION 9**. . . . . . . . . . . . . . . . . . . . . . . . . . . . .    **APPLICATION**

## SECTION 1 - SCHEDULE OF BENEFITS

**ELIGIBILITY REQUIREMENTS FOR INSURANCE BENEFITS**

**Minimum Hourly Requirement:**

Employees working a minimum of 17.5 regularly scheduled hours per week

**Long Term Disability Benefits:**

Class 1:    All Regular Full-Time and Regular Part-Time Employees of The Coca-Cola Company or a covered affiliate, except Employees of Caribbean Refrescos, Inc. (CRI), Refreshment Product Services, Inc. (RPSI), and The Minute Maid Company in Puerto Rico, participating in the Core Plan

Class 2:    All Regular Full-Time and Regular Part-Time Employees of The Coca-Cola Company or a covered affiliate, except Employees of Caribbean Refrescos, Inc. (CRI), Refreshment Product Services, Inc. (RPSI), and The Minute Maid Company in Puerto Rico, electing to participate in the Buy-Up Plan

Class 3:    All Regular Full-Time and Regular Part-Time Employees of Caribbean Refrescos, Inc. (CRI), Refreshment Product Services, Inc. (RPSI), and The Minute Maid Company in Puerto Rico

Note:    Interns, co-op, temporary, seasonal and leased Employees, as defined by their employer, are not covered under this policy.

Employees represented by a bargaining agent may not participate in this plan unless participation has been agreed to by both the bargaining agent and the Sponsor.

**Eligibility Waiting Period:**

1.   If the Covered Person is employed by the Sponsor on the policy effective date - None

2.   If the Covered Person begins employment for the Sponsor after the policy effective date - None

**Employee Contributions Required:**    Class 1 - Core Plan        No
Class 2 - Buy-Up Plan    Yes
Class 3                No

**Name of Participating Affiliates:   See Section 3 - Eligibility and Effective Dates**

**LONG TERM DISABILITY COVERAGE**

**Elimination Period:**

The greater of:

a.   the end of the Covered Person's Short Term Disability Benefits; or

b.   180 days.

**Form ADOP-SCH-1**                                **Schedule of Benefits**

## SECTION 1 - SCHEDULE OF BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Amount of Insurance:**

Class 1 - Core Plan:    60% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $20,000 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

Class 2 - Buy-Up Plan:   70% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $23,333 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

Class 3:   60% of Basic Monthly Earnings not to exceed a Maximum Monthly Benefit of $20,000 less Other Income Benefits and Other Income Earnings as outlined in Section 4.

**Maximum Basic Monthly Earnings on which the Benefit is Based:**                $33,333

**Own Occupation Duration:**    24 Month Own Occupation

**Maximum Benefit Period:**

| Age at Disability | Maximum Benefit Period |
|---|---|
| Less than age 60 | to age 65 (but not less than 5 years) |
| 60 | 60 months |
| 61 | 48 months |
| 62 | 42 months |
| 63 | 36 months |
| 64 | 30 months |
| 65 | 24 months |
| 66 | 21 months |
| 67 | 18 months |
| 68 | 15 months |
| 69 and over | 12 months |

**Form ADOP-SCH-2**                                                                 **Schedule of Benefits**

## SECTION 2 - DEFINITIONS

In this section Liberty defines some basic terms needed to understand this policy.  The male pronoun whenever used in this policy includes the female.

**"Active Employment"** means the Employee must be actively at work for the Sponsor:

1.  on a regular full-time or regular part-time basis and paid regular earnings;
2.  for at least the minimum number of hours shown in the Schedule of Benefits; and either perform such work:

    a.  at the Sponsor's usual place of business; or
    b.  at a location to which the Sponsor's business requires the Employee to travel.

An Employee will be considered actively at work if he was actually at work on the day immediately preceding:

1.  a weekend (except where one or both of these days are scheduled work days);
2.  holidays (except when the holiday is a scheduled work day);
3.  paid vacations;
4.  any non-scheduled work day;
5.  an excused leave of absence (except medical leave for the Covered Person's own disabling condition and lay-off); and
6.  an emergency leave of absence (except emergency medical leave for the Covered Person's own disabling condition).

**"Administrative Office"** means Liberty Life Assurance Company of Boston, 9 Riverside Road, Weston, MA 02493.

**"Annual Enrollment Period"** or **"Enrollment Period"** means the period before each policy anniversary so designated by the Sponsor and Liberty during which an Employee may enroll for coverage under this policy.

**"Any Occupation"** means any occupation that the Covered Person is or becomes reasonably fitted by training, education, experience, age, physical and mental capacity.

**"Application"** is the document designated in Section 9; it is attached to and is made a part of this policy.

**"Appropriate Available Treatment"** means care or services which are:

1.  generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
2.  accessible within the Covered Person's geographical region;
3.  provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
4.  in accordance with generally accepted medical standards of practice.

**"Basic Monthly Earnings"** means the Covered Person's monthly rate of earnings from the Sponsor in effect as of the September 1st immediately prior to the date Disability or Partial Disability begins or date of hire, if later. However, such earnings will not include bonuses, commissions, overtime pay and extra compensation.

**"Covered Person"** means an Employee insured under this policy.

**Form ADOP-DEF-1/2**                                                       **Definitions**

## SECTION 2 - DEFINITIONS
(Continued)

**"Disability"** or **"Disabled"** means:

1.  For persons other than pilots, co-pilots, and crewmembers of an aircraft:

    i.  if the Covered Person is eligible for the 24 Month Own Occupation benefit, **"Disability"** or **"Disabled"** means that during the Elimination Period and the next 24 months of Disability the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and

    ii. thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation.

2.  With respect to Covered Persons employed as pilots, co-pilots and crewmembers of an aircraft:

    **"Disability" or "Disabled"** means as a result of Injury or Sickness the Covered Person is unable to perform the Material and Substantial Duties of Any Occupation.

**"Disability Benefits under a Retirement Plan"** means money which:

1.  is payable under a Retirement Plan due to Disability as defined in that plan; and

2.  does not reduce the amount of money which would have been paid as Retirement Benefits at the normal retirement age under the plan if the Disability had not occurred. (If the payment does cause such a reduction, it will be deemed a Retirement Benefit as defined in this policy.)

**"Eligibility Date"** means the date an Employee becomes eligible for insurance under this policy. Eligibility Requirements are shown in the Schedule of Benefits.

**"Eligible Survivor"** means the Covered Person's spouse, if living, otherwise the Covered Person's children under age 25.

**"Eligibility Waiting Period"** means the continuous length of time an Employee must be in Active Employment in an eligible class to reach his Eligibility Date.

**"Elimination Period"** means a period of consecutive days of Disability for which no benefit is payable. The Elimination Period is shown in the Schedule of Benefits and begins on the first day of Disability.

If the Covered Person returns to work for any 30 or fewer days during the Elimination Period and cannot continue, Liberty will count only those days the Covered Person is Disabled to satisfy the Elimination Period.

**"Employee"** means a person in Active Employment with the Sponsor.

**"Enrollment Form"** is the document completed by the Covered Person, if required, when enrolling for coverage. This form must be satisfactory to Liberty.

**Form ADOP-DEF-3/4**                                                      **Definitions**

## SECTION 2 - DEFINITIONS
(Continued)

**"Extended Treatment Plan"** means continued care that is consistent with the American Psychiatric Association's standard principles of Treatment, and is in lieu of confinement in a Hospital or Institution.  It must be approved in writing by a Physician.

**"Family and Medical Leave"** means a leave of absence for the birth, adoption or foster care of a child, or for the care of the Covered Person's child, spouse or parent or for the Covered Person's own serious health condition as those terms are defined by the Federal Family and Medical Leave Act of 1993 (FMLA) and any amendments, or by applicable state law.

**"Gross Monthly Benefit"** means the Covered Person's Monthly Benefit before any reduction for Other Income Benefits and Other Income Earnings.

**"Hospital"** or **"Institution"** means a facility licensed to provide Treatment for the condition causing the Covered Person's Disability.

**"Initial Enrollment Period"** means one of the following periods during which an Employee may first enroll for coverage under this policy:

1. for an Employee who is eligible for insurance on the policy effective date, a period before the policy effective date set by the Sponsor and Liberty.

2. for an Employee who becomes eligible for insurance after the policy effective date, the period which ends 60 days after his Eligibility Date.

**"Injury"** means bodily impairment resulting directly from an accident and independently of all other causes. For the purpose of determining benefits under this policy:

1. any Disability which begins more than 60 days after an Injury will be considered a Sickness; and

2. any Injury which occurs before the Covered Person is covered under this policy, but which accounts for a medical condition that arises while the Covered Person is covered under this policy will be treated as a Sickness.

**"Last Monthly Benefit"** means the net Monthly Benefit payable to the Covered Person prior to his death without any reduction for earnings received from employment.

**"Material and Substantial Duties"** means responsibilities that are normally required to perform the Covered Person's Own Occupation, or any other occupation, and cannot be reasonably eliminated or modified.

## SECTION 2 - DEFINITIONS
(Continued)

**"Mental Illness"** means a psychiatric or psychological condition classified as such in the most current edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) regardless of the underlying cause of the Mental Illness. If the DSM is discontinued, Liberty will use the replacement chosen or published by the American Psychiatric Association.

**"Monthly Benefit"** means the monthly amount payable by Liberty to the Disabled or Partially Disabled Covered Person.

**"Own Occupation"** means the Covered Person's occupation that he was performing when his Disability or Partial Disability began. For the purposes of determining Disability under this policy, Liberty will consider the Covered Person's occupation as it is normally performed in the national economy.

**"Partial Disability"** or **"Partially Disabled"** means the Covered Person, as a result of Injury or Sickness, is able to:

1.   perform one or more, but not all, of the Material and Substantial Duties of his Own Occupation or Any Occupation on an Active Employment or a part-time basis; or

2.   perform all of the Material and Substantial Duties of his Own Occupation or Any Occupation on a part-time basis; and

3.   earn between 20% and 80% of his Basic Monthly Earnings.

**"Physician"** means a person who:

1.   is licensed to practice medicine and is practicing within the terms of his license; or

2.   is a licensed practitioner of the healing arts in a category specifically favored under the health insurance laws of the state where the Treatment is received and is practicing within the terms of his license.

It does not include a Covered Person, any family member or domestic partner.

**"Proof"** means the evidence in support of a claim for benefits and includes, but is not limited to, the following:

1.   a claim form completed and signed (or otherwise formally submitted) by the Covered Person claiming benefits;

2.   an attending Physician's statement completed and signed (or otherwise formally submitted) by the Covered Person's attending Physician; and

3.   the provision by the attending Physician of standard diagnosis, chart notes, lab findings, test results, x-rays and/or other forms of objective medical evidence in support of a claim for benefits.

Proof must be submitted in a form or format satisfactory to Liberty.

**Form ADOP-DEF-7/8/9**                                                      **Definitions**

## SECTION 2 - DEFINITIONS
(Continued)

**"Regular Attendance"** means the Covered Person's personal visits to a Physician which are medically necessary according to generally accepted medical standards to effectively manage and treat the Covered Person's Disability or Partial Disability.

**"Retirement Benefit under a Retirement Plan"** means money which:

1.  is payable under a Retirement Plan either in a lump sum or in the form of periodic payments;

2.  does not represent contributions made by an Employee (payments which represent Employee contributions are deemed to be received over the Employee's expected remaining life regardless of when such payments are actually received); and

3.  is payable upon:

    a.  early or normal retirement; or
    b.  Disability, if the payment does reduce the amount of money which would have been paid under the plan at the normal retirement age.

**"Retirement Plan"** means a plan which provides Retirement Benefits to Employees and which is not funded wholly by Employee contributions. The term shall not include a profit-sharing plan, informal salary continuation plan, registered retirement savings plan, stock ownership plan, 401(K) or a non-qualified plan of deferred compensation.

**"Schedule of Benefits"** means the section of this policy which shows, among other things, the Eligibility Requirements, Eligibility Waiting Period, Elimination Period, Amount of Insurance, Minimum Benefit, and Maximum Benefit Period.

**"Sickness"** means illness, disease, pregnancy or complications of pregnancy.

**"Sponsor"** means the entity to whom this policy is issued.

**"Sponsor's Retirement Plan"** is deemed to include any Retirement Plan:

1.  which is part of any Federal, State, Municipal or Association retirement system; or

2.  for which the Employee is eligible as a result of employment with the Sponsor.

**"Substance Abuse"** means alcohol and/or drug abuse, addiction or dependency.

**"Treatment"** means consulting, receiving care or services provided by or under the direction of a Physician including diagnostic measures, being prescribed drugs and/or medicines, whether the Covered Person chooses to take them or not, and taking drugs and/or medicines.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Applicable to Class 3**

**Eligibility Requirements for Insurance Benefits**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**Eligibility Date for Insurance Benefits**

An Employee in an eligible class will qualify for insurance on the later of:

1.   this policy's effective date; or

2.   the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee's application or enrollment for insurance is made with Liberty through the Sponsor in a form or format satisfactory to Liberty.

An Employee will be insured for non-contributory coverage on his Eligibility Date.

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness.  The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Applicable to Classes 1 and 2**

**Eligibility Requirements for Insurance Benefits**

The eligibility requirements for insurance benefits are shown in the Schedule of Benefits.

**Eligibility Date for Insurance Benefits**

An Employee in an eligible class will qualify for insurance on the later of:

1. this policy's effective date; or

2. the day after the Employee completes the Eligibility Waiting Period shown in the Schedule of Benefits.

**Initial Enrollment Period**

During the Initial Enrollment Period an Employee can enroll in any one coverage or coverage option shown in the Schedule of Benefits.  If he does not choose any coverage or coverage option, he will automatically be enrolled in the Core Plan.  If an Employee's Initial Enrollment Period takes place during or after the Annual Enrollment Period, but before the policy anniversary his coverage option will apply for (a) the rest of the policy year in which he first becomes eligible; and (b) the next policy year.

> **Applicable to Employees who were previously eligible for coverage under this policy and who return to work beyond the time period allowed for an approved leave of absence as defined in this policy.**
>
> If an employee returns to work in the same plan year and prior to Annual Enrollment, he will have the same coverage that was in place prior to the approved leave of absence.  If an employee returns to work in a new plan year and following Annual Enrollment, he will have the option to elect the Buy-Up Plan.

**Annual Enrollment Period**

During each Annual Enrollment Period, a Covered Person may keep his coverage at the same level or make one of the following changes in coverage for the next policy year:

1. a decrease in coverage;

2. an increase in coverage by one level without Evidence of Insurability subject to the Pre-Existing Condition Exclusion defined herein.

If a Covered Person fails to enroll for a change in his coverage option during any Annual Enrollment Period he will continue to be insured for the same coverage option during the next policy year and no change in that coverage can be made during the next policy year.

<div style="display:flex; justify-content:space-between;">

**Form ADOP-ELG-4**

**Multiple Option Plan**
**Eligibility and Effective Dates**

</div>

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Applicable to Classes 1 and 2** (Continued)

**Effective Date of Insurance**

Insurance will be effective at 12:01 A.M. Standard Time in the governing jurisdiction on the day determined as follows, but only if the Employee's application or enrollment for insurance is made with Liberty through the Sponsor in a form or format satisfactory to Liberty.

1.  For Coverage Applied for During Initial Enrollment Periods:

    a.  an Employee will be insured for non-contributory coverage on his Eligibility Date.

    b.  an Employee will be insured for contributory coverage on the date the Employee makes application for insurance if he enrolls on or before the 60th day after his Eligibility Date; or

    c.  an Employee who does not enroll for contributory coverage on or before the 60th day after his Eligibility Date, or terminated his insurance while continuing to be eligible may not enroll for contributory coverage until the next Annual Enrollment Period.

2.  For Contributory Coverage Applied for During Annual Enrollment Periods

    An Employee will be insured for the selected contributory coverage on the first day of the next policy anniversary.

**Delayed Effective Date for Insurance**

The effective date of any initial, increased or additional insurance will be delayed for an individual if he is not in Active Employment because of Injury or Sickness.  The initial, increased or additional insurance will begin on the date the individual returns to Active Employment.

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Family and Medical Leave**

An Employee's coverage may be continued under this policy for an approved family or medical leave of absence for up to 12 weeks following the date coverage would have terminated, subject to the following:

1.  the authorized leave is in writing;

2.  the required premium is paid;

3.  the Covered Person's benefit level, or the amount of earnings upon which the Covered Person's benefit may be based, will be that in effect on the date before said leave begins; and

4.  continuation of coverage will cease immediately if any one of the following events should occur:

    a.  the Covered Person returns to work;
    b.  this group insurance policy terminates;
    c.  the Covered Person is no longer in an eligible class;
    d.  nonpayment of premium when due by the Sponsor or the Covered Person;
    e.  the Covered Person's employment terminates.

**Leave of Absence - Applicable to a Military Leave of Absence under the Uniformed Services Employment and Reemployment Rights Act (USERRA)**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is given a Military leave of absence.

The Covered Person's coverage will not continue beyond the end of the policy month following 12 months from the date the leave of absence begins.  In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Leave of Absence - Applicable to All Other Leaves of Absence**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is given a leave of absence, other than a Military leave of absence.

The Covered Person's coverage will not continue beyond the end of the policy month following 90 days from the date the leave of absence begins.  In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

**Lay-off**

The Sponsor may continue the Covered Person's coverage(s) by paying the required premiums, if the Covered Person is temporarily laid off.

The Covered Person's coverage will not continue beyond the end of the policy month in which the lay-off begins.  In continuing such coverage under this provision, the Sponsor agrees to treat all Covered Persons equally.

# SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Participating Affiliates**

Companies, corporations, firms or individuals that are subsidiary to, or affiliated with, the Sponsor will be called Participating Affiliates.  The Participating Affiliates, if any, are listed below.  Employees of Participating Affiliates will be considered Employees of the Sponsor for purposes of this policy.

As they relate to this policy, all actions, agreements and notices between Liberty and the Sponsor will be binding on the Participating Affiliates.

If a Participating Affiliate ceases to be a Participating Affiliate for any reason, its Employees will be deemed to have transferred to a class of Employees not eligible for coverage under this policy.

The Coca-Cola Export Corporation
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA  30301

Soft Drinks International, Inc.
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA  30301

Rocketcash LLC
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA  30301

Caribbean Refrescos, Inc.
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA  30301

Coca-Cola Interamerican Corporation Inc.
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA  30301

The Minute Maid Trading Company
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA   30301

Caribbean International Sales Corporation, Inc
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA  30301

Refreshment Product Services, Inc.
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA   30301

Soft Drink Services Corporation
c/o The Coca-Cola Company
P. O. Box #1734
Atlanta, GA   30301

## SECTION 3 - ELIGIBILITY AND EFFECTIVE DATES
(Continued)

**Transfer Provision**

In order to prevent loss of coverage for an individual because of transfer of insurance carriers, this policy will provide coverage for certain individuals as follows:

**Failure to be In Active Employment Due to Injury or Sickness:**

Subject to premium payments, this policy will cover individuals who:

1.  at the time of transfer are covered under the prior plan; and

2.  are not in Active Employment due to Injury or Sickness on the effective date of this policy.

Benefits will be determined based on the lesser of:

1.  the amount of the Disability benefit that would have been payable under the prior plan and subject to any applicable policy limitations; or

2.  the amount of Disability benefits payable under this policy.  If benefits are payable under the prior plan for the Disability, no benefits are payable under this policy.

**Disability Due to a Pre-Existing Condition**

If an individual was covered under the prior plan at the time of transfer and was in Active Employment and insured under this policy on its effective date, benefits may be payable for a Disability due to a Pre-Existing Condition.

If the individual can satisfy this policy's Pre-Existing Condition Exclusion, the benefit will be determined according to this policy.

If the individual cannot satisfy this policy's Pre-Existing Condition Exclusion, then:

1.  Liberty will apply the Pre-Existing Condition Exclusion of the prior plan and;

2.  if the individual would have satisfied the prior plan's pre-existing condition exclusion, giving consideration towards continuous time coverage under this policy and the prior plan, the benefit will be determined according to this policy.  However, the Maximum Monthly Benefit amount payable under this policy shall not exceed the maximum monthly benefit payable under the prior plan.

No benefit will be paid if the individual cannot satisfy the Pre-Existing Condition Exclusions of either policy/plan.

## SECTION 4 - DISABILITY INCOME BENEFITS

**LONG TERM DISABILITY COVERAGE**

**Disability Benefit**

When Liberty receives Proof that a Covered Person is Disabled due to Injury or Sickness and requires the Regular Attendance of a Physician, Liberty will pay the Covered Person a Monthly Benefit after the end of the Elimination Period, subject to any other provisions of this policy.  The benefit will be paid for the period of Disability if the Covered Person gives to Liberty Proof of continued:

1. Disability;

2. Regular Attendance of a Physician; and

3. Appropriate Available Treatment.

The Proof must be given upon Liberty's request and at the Covered Person's expense.  In determining whether the Covered Person is Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Disability, the Injury must occur and Disability must begin while the Employee is insured for this coverage.

The Monthly Benefit will not:

1. exceed the Covered Person's Amount of Insurance; or

2. be paid for longer than the Maximum Benefit Period.

The Amount of Insurance and the Maximum Benefit Period are shown in the Schedule of Benefits.

**Amount of Disability Monthly Benefit**

To figure the amount of Monthly Benefit:

1. Take the lesser of:

   a. the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits; or

   b. the Maximum Monthly Benefit shown in the Schedule of Benefits; and then

2. Deduct Other Income Benefits and Other Income Earnings, (shown in the Other Income Benefits and Other Income Earnings provision of this policy), from this amount.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Partial Disability**

When Liberty receives Proof that a Covered Person is Partially Disabled and has experienced a loss of earnings due to Injury or Sickness and requires the Regular Attendance of a Physician, he may be eligible to receive a Monthly Benefit, subject to any other provisions of this policy.  To be eligible to receive Partial Disability benefits, the Covered Person may be employed in his Own Occupation or another occupation, must satisfy the Elimination Period and must be earning between 20% and 80% of his Basic Monthly Earnings.

A Monthly Benefit will be paid for the period of Partial Disability if the Covered Person gives to Liberty Proof of continued:

1.  Partial Disability;

2.  Regular Attendance of a Physician; and

3.  Appropriate Available Treatment.

The Proof must be given upon Liberty's request and at the Covered Person's expense.  In determining whether the Covered Person is Partially Disabled, Liberty will not consider employment factors including, but not limited to, interpersonal conflict in the workplace, recession, job obsolescence, paycuts, job sharing and loss of a professional or occupational license or certification.

For purposes of determining Partial Disability, the Injury must occur and Partial Disability must begin while the Employee is insured for this coverage.

**Loss of Earnings Monthly Calculation with Work Incentive Benefit**

For the first 12 months, the work incentive benefit will be an amount equal to the Covered Person's Basic Monthly Earnings multiplied by the benefit percentage shown in the Schedule of Benefits, without any reductions from earnings.  The work incentive benefit will only be reduced, if the Monthly Benefit payable plus any earnings exceed 100% of the Covered Person's Basic Monthly Earnings.  If the combined total is more, the Monthly Benefit will be reduced by the excess amount so that the Monthly Benefit plus the Covered Person's earnings does not exceed 100% of his Basic Monthly Earnings.

Thereafter, the Monthly Benefit will be calculated as follows:

1.  The Covered Person's Basic Monthly Earnings minus the Covered Person's earnings received while he is Partially Disabled.  This figure represents the amount of lost earnings.

2.  Multiply the amount of lost earnings by 75%; and then

3.  deduct Other Income Benefits (shown in the Other Income Benefits and Other Income Earnings provision of this policy) from this amount.

# SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Mental Illness and/or Substance Abuse Limitation**

The benefit for Disability due to Mental Illness and/or Substance Abuse will not exceed a combined period of 24 months of Monthly Benefit payments while the Covered Person is insured under this policy.

If the Covered Person is in a Hospital or Institution for Mental Illness and/or Substance Abuse at the end of the combined period of 24 months, the Monthly Benefit will be paid during the confinement.

If the Covered Person is not confined in a Hospital or Institution for Mental Illness and/or Substance Abuse, but is fully participating in an Extended Treatment Plan for the condition that caused Disability, the Monthly Benefit will be payable to a Covered Person for up to a combined period of 36 months.

In no event will the Monthly Benefit be payable beyond the Maximum Benefit Period shown in the Schedule of Benefits.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Three Month Survivor Benefit**

Liberty will pay a lump sum benefit to the Eligible Survivor when Proof is received that a Covered Person died:

1.  after Disability had continued for 180 or more consecutive days; and

2.  while receiving a Monthly Benefit.

The lump sum benefit will be an amount equal to three times the Covered Person's Last Monthly Benefit.

If the survivor benefit is payable to the Covered Person's children, payment will be made in equal shares to the children, including step children and legally adopted children.  However, if any of said children are minors or incapacitated, payment will be made on their behalf to the court appointed guardian of the property.  This payment will be valid and effective against all claims by others representing or claiming to represent the children.

If an overpayment is due to Liberty at the time of a Covered Person's death, the benefit payable under this provision will be applied toward satisfying the overpayment.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings**

**Other Income Benefits** means:

1. The amount for which the Covered Person is eligible under:

   a. Workers' or Workmen's Compensation Laws;
   b. Occupational Disease Law;
   c. Title 46, United States Code Section 688 (The Jones Act);
   d. any work loss provision in mandatory "No-Fault" auto insurance;
   e. Railroad Retirement Act;
   f. any governmental compulsory benefit act or law; or
   g. any other act or law of like intent.

2. The amount of any Disability benefits which the Covered Person is eligible to receive under:

   a. any other group insurance policy of the Sponsor;
   b. any governmental retirement system as a result of his employment with the Sponsor; or
   c. any individual insurance policy where the premium is wholly or partially paid by the Sponsor. However, Liberty will only reduce the Monthly Benefit if the Covered Person's Monthly Benefit under this policy, plus any benefits that the Covered Person is eligible to receive under such individual insurance plan exceed 100% of the Covered Person's Basic Monthly Earnings. If this sum exceeds 100% of Basic Monthly Earnings, the Covered Person's Monthly Benefit under this policy will be reduced by such excess amount.

3. The amount of benefits the Covered Person receives under the Sponsor's Retirement Plan as follows:

   a. the amount of any Disability Benefits under a Retirement Plan, or Retirement Benefits under a Retirement Plan the Covered Person voluntarily elects to receive as retirement payment under the Sponsor's Retirement Plan; and
   b. the amount the Covered Person receives as retirement payments when he reaches the later of age 62, or normal retirement age as defined in the Sponsor's plan.

4. The amount of Disability and/or Retirement Benefits under the United States Social Security Act, the Canada Pension Plan, the Quebec Pension Plan, or any similar plan or act, which the Covered Person received or is eligible to receive.

5. Any amount the Covered Person receives from any unemployment benefits.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Other Income Benefits and Other Income Earnings** (Continued)

**Other Income Earnings** means:

1.  any amount the Covered Person receives from any formal or informal sick leave or salary continuation plan(s); and

2.  the amount of earnings the Covered Person earns or receives from any form of employment including severance.

Other Income Benefits, except Retirement Benefits, must be payable as a result of the same Disability for which Liberty pays a benefit.  The sum of Other Income Benefits and Other Income Earnings will be deducted in accordance with the provisions of this policy.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Estimation of Benefits**

Liberty will reduce the Covered Person's Disability or Partial Disability benefits by the amount of Other Income Benefits that we estimate are payable to the Covered Person.

The Covered Person's Disability benefit will not be reduced by the estimated amount of Other Income Benefits if the Covered Person:

1.  provides satisfactory proof of application for Other Income Benefits;

2.  signs a reimbursement agreement under which, in part, the Covered Person agrees to repay Liberty for any overpayment resulting from the award or receipt of Other Income Benefits;

3.  if applicable, provides satisfactory proof that all appeals for Other Income Benefits have been made on a timely basis to the highest administrative level unless Liberty determines that further appeals are not likely to succeed; and

4.  if applicable, submits satisfactory proof that Other Income Benefits have been denied at the highest administrative level unless Liberty determines that further appeals are not likely to succeed.

Liberty will not estimate or reduce for any benefits under the Sponsor's pension or retirement benefit plan according to applicable law, until the Covered Person actually receives them.

In the event that Liberty overestimates the amount payable to the Covered Person from any plans referred to in the Other Income Benefits and Other Income Earnings provision of this policy, Liberty will reimburse the Covered Person for such amount upon receipt of written proof of the amount of Other Income Benefits awarded (whether by compromise, settlement, award or judgement) or denied (after appeal through the highest administrative level).

**Social Security Assistance**

Liberty may help a Covered Person in applying for Social Security Disability Income Benefits.  In order to be eligible for assistance the Covered Person must be receiving a Monthly Benefit from Liberty.  Such assistance will be provided only if Liberty determines that assistance would be beneficial.

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Lump Sum Payments**

Other Income Benefits from a compromise, settlement, award or judgement which are paid to the Covered Person in a lump sum and are meant to compensate the Covered Person for any one or more of the following:

1. loss of past or future wages;
2. impaired earnings capacity;
3. lessened ability to compete in the open labor market;
4. any degree of permanent impairment; and
5. any degree of loss of bodily function or capacity;

will be prorated on a monthly basis as follows:

1. over the period of time such benefits would have been paid if not in a lump sum; or

2. if such period of time cannot be determined, the lesser of:

   a. the remainder of the Maximum Benefit Period; or
   b. 5 years.

**Cost of Living Freeze**

After the first deduction for each of the Other Income Benefits, the Monthly Benefit will not be further reduced due to any cost of living increases payable under the Other Income Benefits and Other Income Earnings provision of this policy.  This provision does not apply to increases received from any form of employment.

**Prorated Benefits**

For any period for which a Long Term Disability benefit is payable that does not extend through a full month, the benefit will be paid on a prorated basis.  The rate will be 1/30th for each day for such period of Disability.

**Discontinuation of the Long Term Disability Benefit**

The Monthly Benefit will cease on the earliest of:

1. the date the Covered Person fails to provide Proof of continued Disability or Partial Disability and Regular Attendance of a Physician;

2. the date the Covered Person fails to cooperate in the administration of the claim.  Such cooperation includes, but is not limited to, providing any information or documents needed to determine whether benefits are payable or the actual benefit amount due;

3. the date the Covered Person refuses to be examined or evaluated at reasonable intervals;

4. the date the Covered Person refuses to receive Appropriate Available Treatment;

**Form ADOP-LTD-25/26**                                                                                    **Long Term Disability**

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Discontinuation of the Long Term Disability Benefit** (Continued)

The Monthly Benefit will cease on the earliest of: (Continued)

5. the date the Covered Person refuses a job with the Sponsor where workplace modifications or accommodations were made to allow the Covered Person to perform the Material and Substantial Duties of the job;

6. the date the Covered Person is able to work in his Own Occupation on a part-time basis, but chooses not to;

7. the date the Covered Person's current Partial Disability earnings exceed 80% of his Basic Monthly Earnings;

   Because the Covered Person's current earnings may fluctuate, Liberty will average earnings over three consecutive months rather than immediately terminating his benefit once 80% of Basic Monthly Earnings has been exceeded.

8. the date the Covered Person is no longer Disabled according to this policy;

9. the end of the Maximum Benefit Period; or

10. the date the Covered Person dies.

**Form ADOP-LTD-26** (Cont.)                                      **Long Term Disability**

## SECTION 4 - DISABILITY INCOME BENEFITS
(Continued)

**LONG TERM DISABILITY COVERAGE** (Continued)

**Successive Periods of Disability**

With respect to this policy, **"Successive Periods of Disability"** means a Disability which is related or due to the same cause(s) as a prior Disability for which a Monthly Benefit was payable.

A Successive Period of Disability will be treated as part of the prior Disability if, after receiving Disability benefits under this policy, a Covered Person:

1.  returns to his Own Occupation on an Active Employment basis for less than three continuous months; and

2.  performs all the Material and Substantial Duties of his Own Occupation.

To qualify for a Successive Periods of Disability benefit, the Covered Person must experience more than a 20% loss of Basic Monthly Earnings.

Benefit payments will be subject to the terms of this policy for the prior Disability.

If a Covered Person returns to his Own Occupation on an Active Employment basis for three continuous months or more, the Successive Period of Disability will be treated as a new period of Disability.  The Covered Person must complete another Elimination Period.

If a Covered Person becomes eligible for coverage under any other group long term disability coverage, this Successive Period of Disability provision will cease to apply to that Covered Person.

## SECTION 5 - EXCLUSIONS

**GENERAL EXCLUSIONS**

This policy will not cover any Disability due to:

1.  war, declared or undeclared, or any act of war;

2.  intentionally self-inflicted injuries, while sane or insane;

3.  active Participation in a Riot;

4.  the committing of or attempting to commit a felony or misdemeanor;

5.  cosmetic surgery unless such surgery is in connection with an Injury or Sickness sustained while the individual is a Covered Person; or

6.  a gender change, including, but not limited to, any operation, drug therapy or any other procedure related to a gender change.

No benefit will be payable during any period of incarceration.

With respect to this provision, **Participation** shall include promoting, inciting, conspiring to promote or incite, aiding, abetting, and all forms of taking part in, but shall not include actions taken in defense of public or private property, or actions taken in defense of the Covered Person, if such actions of defense are not taken against persons seeking to maintain or restore law and order including, but not limited to police officers and fire fighters.

With respect to this provision, **Riot** shall include all forms of public violence, disorder or disturbance of the public peace, by three or more persons assembled together, whether or not acting with a common intent and whether or not damage to persons or property or unlawful act or acts is the intent or the consequence of such disorder.

**Form ADOP-EXC-1**                                                                                     **General Exclusions**

## SECTION 5 - EXCLUSIONS
(Continued)

**LONG TERM DISABILITY COVERAGE**

**Applicable to Class 3**

**Pre-Existing Condition Exclusion**

This policy will not cover any Disability or Partial Disability:

1. which is caused or contributed to by, or results from a Pre-Existing Condition; and

2. which begins in the first 12 months immediately after the Covered Person's effective date of coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage.

## SECTION 5 - EXCLUSIONS
(Continued)

**LONG TERM DISABILITY COVERAGE**

**Applicable to Classes 1 and 2**

**Pre-Existing Condition Exclusion(s)**

This policy will not cover any Disability or Partial Disability:

1.   which is caused or contributed to by, or results from a Pre-Existing Condition; and

2.   which begins in the first 12 months immediately after the Covered Person's effective date of coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of coverage.

**For Employees who Increase their Coverage Option During an Annual Enrollment Period:**

This policy will not cover the increase in amount of coverage for any Disability or Partial Disability:

1.   which is caused or contributed to by, or results from a Pre-Existing Condition; and

2.   which begins in the first 12 months immediately after the Covered Person's effective date of increased coverage.

**"Pre-Existing Condition"** means a condition resulting from an Injury or Sickness for which the Covered Person is diagnosed or received Treatment within three months prior to the Covered Person's effective date of increased coverage.

## SECTION 6 - TERMINATION PROVISIONS

**Termination of a Covered Person's Insurance**

A Covered Person will cease to be insured on the earliest of the following dates:

1.  the date this policy terminates, but without prejudice to any claim originating prior to the time of termination;

2.  the date the Covered Person is no longer in an eligible class;

3.  the date the Covered Person's class is no longer included for insurance;

4.  the last day for which any required Employee contribution has been made;

5.  the date employment terminates.  Cessation of Active Employment will be deemed termination of employment, except the insurance will be continued for an Employee absent due to Disability during:

    a.  the Elimination Period; and
    b.  any period during which premium is being waived.

6.  the date the Covered Person ceases active work due to a labor dispute, including any strike, work slowdown, or lockout.

Liberty reserves the right to review and terminate all classes insured under this policy if any class(es) cease(s) to be covered.

**Form ADOP-TER-1**                                              **Termination Provisions**

## SECTION 6 - TERMINATION PROVISIONS
(Continued)

**Applicable to Class 3**

**Policy Termination**

1.   Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2.   If the Sponsor fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight Standard Time on the last day of the grace period.  The Sponsor may terminate this policy by advance written notice delivered to Liberty at least 31 days prior to the termination date.  This policy will not terminate during any period for which premium has been paid.  The Sponsor will be liable to Liberty for all premiums due and unpaid for the full period for which this policy is in force.

3.   Liberty may terminate this policy on any premium due date by giving written notice to the Sponsor at least 60 days in advance if:

     a.   the number of Employees insured is fewer than 10; or

     b.   less than 100% of the Employees eligible for any non-contributory insurance are insured for it; or

     c.   the Sponsor fails:

          i.    to furnish promptly any information which Liberty may reasonably require; or
          ii.   to perform any other obligations pertaining to this policy.

4.   Liberty may terminate this policy or any coverage(s) afforded hereunder and for any class of covered Employees on any premium due date after it has been in force for 12 months.  Liberty will provide written notice of such termination to the Sponsor at least 60 days before the termination is effective.

5.   Termination may take effect on an earlier date if agreed to by the Sponsor and Liberty.

**Form ADOP-TER-2.1**                                                                                     **Termination Provisions**

## SECTION 6 - TERMINATION PROVISIONS
(Continued)

**Applicable to Classes 1 and 2**

**Policy Termination**

1.  Termination of this policy under any conditions will not prejudice any claim which occurs while this policy is in force.

2.  If the Sponsor fails to pay any premium within the grace period, this policy will terminate at 12:00 midnight Standard Time on the last day of the grace period.  The Sponsor may terminate this policy by advance written notice delivered to Liberty at least 31 days prior to the termination date.  This policy will not terminate during any period for which premium has been paid.  The Sponsor will be liable to Liberty for all premiums due and unpaid for the full period for which this policy is in force.

3.  Liberty may terminate this policy on any premium due date by giving written notice to the Sponsor at least 60 days in advance if:

    a.  the number of Employees insured is fewer than 10; or

    b.  less than 100% of all the Employees eligible for any non-contributory insurance are insured for it; or

    c.  less than 25% of all the Employees eligible for any contributory insurance are insured for it; or

    d.  the Sponsor fails:

        i.   to furnish promptly any information which Liberty may reasonably require; or
        ii.  to perform any other obligations pertaining to this policy.

4.  Liberty may terminate this policy or any coverage(s) afforded hereunder and for any class of covered Employees on any premium due date after it has been in force for 12 months.  Liberty will provide written notice of such termination to the Sponsor at least 60 days before it is effective.

5.  Termination may take effect on an earlier date if agreed to by the Sponsor and Liberty.

**Termination of Coverage Option(s)**

**Participation Requirements**

Liberty may terminate coverage or any coverage option afforded hereunder on any premium due date by giving written notice to the Sponsor at least 31 days in advance:

1.  if the overall participation for all coverage options falls below 25% of the Employees eligible for benefits under this policy; and

2.  if less than 25% of the Employees eligible for each coverage option are insured for it.

Termination may take effect on an earlier date if agreed to by the Sponsor and Liberty.

<div align="right">

**Long Term Disability**
</div>

**Form ADOP-TER-3.1**                                    **Multiple Option Plan Termination Provisions**

## SECTION 7 - GENERAL PROVISIONS

**Assignment**

No assignment of any present or future right or benefit under this policy will be allowed.

**Complete Contract - Policy Changes**

1.  This policy is the entire contract. It consists of:

    a.   all of the pages; and
    b.   the attached signed Application of the Sponsor; and
    c.   if contributory each Employee's signed application for insurance.

2.  This policy may be changed in whole or in part.  Only an officer of Liberty can approve a change.  The approval must be in writing and endorsed on or attached to this policy.

3.  No other person, including an agent, may change this policy or waive any part of it.

**Conformity with State Statutes**

Any provision of this policy which, on its effective date, is in conflict with the statutes of the governing jurisdiction of this policy is hereby amended to conform to the minimum requirements of such statute.

**Employee's Certificate**

Liberty will provide a Certificate to the Sponsor for delivery to Covered Persons.  It will state:

1.   the name of the insurance company and the policy number;
2.   a description of the insurance provided;
3.   the method used to determine the amount of benefits;
4.   to whom benefits are payable;
5.   limitations or reductions that may apply;
6.   the circumstances under which insurance terminates; and
7.   the rights of the Covered Person upon termination of this policy.

If the terms of a Certificate and this policy differ, this policy will govern.

**Examination**

Liberty, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Furnishing of Information - Access to Records**

1.  The Sponsor will furnish at regular intervals to Liberty:

    a.  information relative to Employees:

        i.   who qualify to become insured;
        ii.  whose amounts of insurance change; and/or
        iii. whose insurance terminates.

    b.  any other information about this policy that may be reasonably required.

    The Sponsor's records which, in the opinion of Liberty, have a bearing on the insurance will be opened for inspection at any reasonable time.

2.  Clerical error or omission will not:

    a.  deprive an Employee of insurance;
    b.  affect an Employee's Amount of Insurance; or
    c.  effect or continue an Employee's insurance which otherwise would not be in force.

**Interpretation of the Policy**

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

**Incontestability**

The validity of this policy shall not be contested, except for non-payment of premiums, after it has been in force for two years from the date of issue.  The validity of this policy shall not be contested on the basis of a statement made relating to insurability by any person covered under this policy after such insurance has been in force for two years during such person's lifetime, and shall not be contested unless the statement is contained in a written instrument signed by the person making such statement.

**Legal Proceedings**

A claimant or the claimant's authorized representative cannot start any legal action:

1.  until 60 days after Proof of claim has been given; or

2.  more than one year after the time Proof of claim is required.

Legal actions are contingent upon first having followed the appropriate claims and appeals procedures.

**Form ADOP-GNP-2.15**                                    **General Provisions**

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Misstatement of Age**

If a Covered Person's age has been misstated, an equitable adjustment will be made in the premium.  If the amount of the benefit is dependent upon an Employee's age, the amount of the benefit will be the amount an Employee would have been entitled to if his correct age were known.

A refund of premium will not be made for a period more than 12 months before the date Liberty is advised of the error.

**Notice and Proof of Claim**

1.  **Notice**

    a.  Notice of claim must be given to Liberty within 30 days of the date of the loss on which the claim is based.  If that is not possible, Liberty must be notified as soon as it is reasonably possible to do so.  Such notice of claim must be received in a form or format satisfactory to Liberty.

    b.  When written notice of claim is applicable and has been received by Liberty, the Covered Person will be sent claim forms.  If the forms are not received within 10 days after written notice of claim is sent, the Covered Person can send to Liberty written Proof of claim without waiting for the forms.

2.  **Proof of Claim**

    a.  Satisfactory Proof of loss must be given to Liberty no later than 90 days after the end of the Elimination Period.

    b.  Failure to furnish such Proof within such time shall not invalidate or reduce any claim if it was not reasonably possible to furnish such Proof within such time.  Such Proof must be furnished as soon as reasonably possible, and in no event, except in the absence of legal capacity of the claimant, later than one year from the time Proof is otherwise required.

    c.  Proof of continued loss, continued Disability or Partial Disability, when applicable, and Regular Attendance of a Physician must be given to Liberty within 30 days of the request for such Proof.

Liberty reserves the right to determine if the Covered Person's Proof of loss is satisfactory.

**Payment of Claims**

The benefit is payable to the Covered Person.  But, if a benefit is payable to a Covered Person's estate, a Covered Person who is a minor, or who is not competent, Liberty has the right to pay up to $2,000 to any of the Covered Person's relatives or any other person whom Liberty considers entitled thereto by reason of having incurred expense for the maintenance, medical attendance or burial of the Covered Person.  If Liberty in good faith pays the benefit in such a manner, any such payment shall fulfill Liberty's responsibility for the amount paid.

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Right of Recovery**

Liberty has the right to recover any overpayment of benefits caused by, but not limited to, fraud, any error made by Liberty in processing a claim, or the Covered Person's receipt of any Other Income Benefits. Liberty may recover an overpayment by, but not limited to, the following:

1. requesting a lump sum payment of the overpaid amount;
2. reducing any benefits payable under this policy;
3. taking any appropriate collection activity available including any legal action needed; and
4. placing a lien, if not prohibited by law, in the amount of the overpayment on the proceeds of any Other Income Benefits, whether on a periodic or lump sum basis.

It is required that full reimbursement be made to Liberty.

**Statements**

In the absence of fraud, all statements made in any application are considered representations and not warranties (absolute guarantees). No representation by:

1. the Sponsor in applying for this policy will make it void unless the representation is contained in the signed Application; or
2. any Employee in enrolling for insurance under this policy will be used to reduce or deny a claim unless a copy of the Enrollment Form, signed by the Employee if required, is or has been given to the Employee.

**Reimbursement**

When a Covered Person's Injury or Sickness appears to be someone else's fault, and recovery for personal injury is sought from a third party, by or on behalf of a person for whom Liberty has paid disability income benefits, Liberty may require reimbursement from the Covered Person for these benefits if the following procedures are followed:

1. The person asserting the claim shall provide notice to Liberty by certified mail, unless some other form of notice is agreed to by Liberty. Such notice shall be provided no later than 10 days before the completion of any settlement or commencement of any trial, unless a shorter period is agreed to by Liberty. It shall also include a request for information regarding the existence of any claim and an itemization of payments for which Liberty seeks reimbursement.

2. Once Liberty gets notice from the claimant as described above, Liberty then must provide notice to the claimant, including a specific itemization of payments for which reimbursement is being sought. This notice shall be provided by certified mail or another form agreed to by the designated recipient.

Such reimbursement is limited to the amount allocated to disability damages in the settlement documents or the judgment and only if the amount of the recovery by the injured party exceeds the sum of all economic and non economic losses, exclusive of the losses for which reimbursement is sought. Liberty also must pay a prorata share of the attorney's fees and litigation expenses. If the claimant says that the settlement doesn't exceed the economic and non economic losses, Liberty is entitled to seek a declaratory judgment from a Georgian court to determine to what extent it may share in the settlement. If the court determines that the claimant is not fully compensated, Liberty will not be entitled to any reimbursement.

**Form ADOP-GNP-4.2**                                                                   **General Provisions**

## SECTION 7 - GENERAL PROVISIONS
(Continued)

**Workers' Compensation**

This policy and the coverages provided are not in lieu of, nor will they affect any requirements for coverage under any Workers' Compensation Law or other similar law.

**Form ADOP-GNP-5**                                                        **General Provisions**

## SECTION 8 - PREMIUMS

**Premium Rates**

Liberty has set the premiums that apply to the coverage(s) provided under this policy.  Those premiums are shown in a notice given to the Sponsor with or prior to delivery of this policy.

A change in the initial premium rate(s) will not take effect within the first 24 months, except that Liberty may change premium rates at any time for reasons which affect the risk assumed, including those reasons shown below:

1.  a change occurs in the policy design;

2.  a division, subsidiary or Associated Company is added to or deleted from this policy;

3.  when the number of Covered Persons changes by 15% or more from the number insured on this policy's effective date; or

4.  a change in existing law which affects this policy.

No premium may be changed unless Liberty notifies the Sponsor at least 60 days in advance.  Premium changes may take effect on an earlier date when both Liberty and the Sponsor agree.

**Payment of Premiums**

1.  All premiums due under this policy, including adjustments, if any, are payable by the Sponsor on or before their due dates at Liberty's Administrative Office, or to Liberty's agent.  The due dates are specified on the first page of this policy.

2.  All payments made to or by Liberty shall be in United States dollars.

3.  If premiums are payable on a monthly basis, premiums for additional or increased insurance becoming effective during a policy month will be charged from the next premium due date.

4.  The premium charge for insurance terminated during a policy month will cease at the end of the policy month in which such insurance terminates.  This manner of charging premium is for accounting purposes only.  It will not extend insurance coverage beyond a date it would have otherwise terminated as shown in the "Termination of a Covered Person's Insurance" provision of this policy.

5.  If premiums are payable on other than a monthly basis, premiums for additional, increased, reduced or terminated insurance will cause a prorated adjustment on the next premium due date.

6.  Except for fraud and premium adjustments, refunds of premiums or charges will be made only for:

    1.  the current policy year; and

    2.  the immediately preceding policy year.

**Form ADOP-PRE-1.1**                                                                                              **Premiums**

## SECTION 8 - PREMIUMS
(Continued)

**Grace Period**

This is the 31 days following a premium due date, other than the first, during which premium payment may be made.  During the grace period this policy shall continue in force, unless the Sponsor has given Liberty written notice 31 days in advance of discontinuance of this policy.

**Waiver of Premium**

Premium payments for a Covered Person are waived during any period for which benefits are payable.  If coverage is to be continued, premium payments must be resumed following a period during which they were waived.

**Form ADOP-PRE-2**                                                                                       **Premiums**



Liberty Life Assurance Company of Boston
Disability Claims
P.O. Box 1525
Dover, NH 03821-1525
Phone No.: (800) 210-0268
Secure Fax No.: (603) 743-4794

March 29, 2005

Ms. Jacqueline Everson
1530 Locust Log Way
Austell, GA 30168-0000

RE:    Long Term Disability Benefits
       The Coca-Cola Company
       Claim #: 790865

Dear Ms. Everson:

We are writing to advise you that Dr. Washington did not provide medical documentation to alter the original decision made by independent medical examiner, Dr. D'Auria, Board Certified Orthopedic Surgeon. Therefore, we have maintained our original decision that you are no longer considered disabled from your own occupation per the Coca-Cola Company policy, based on a full, fair and thorough review of your claim. Please see our original letter enclosed.

In good faith, we reopened your claim (while the additional medical information was being reviewed), and issued benefit payment to you through March 3, 2005. Therefore, your written request for review must be sent within 180 days of the receipt of this letter, and state the reasons why you feel your claim should not have been denied. In your request for review, include documentation not already contained in your claim file such as test results, consultations, medical reports, diagnostic test results; any information which you feel will support your claim. You may request to review pertinent claim file documents upon which the denial of benefits was based. If Liberty Life does not receive your written request for review within 180 days of your receipt of this notice, our claim decision will be final, your file will remain closed, and no further review of your claim will be conducted. Under normal circumstances you will be notified of the final decision within 45 days of the date that our request is received. If there are special circumstances requiring delay, you will be notified of the final decision no later than 90 days after your request for review is received.

Nothing in this letter should be construed as a waiver of any Liberty Life Assurance Company of Boston rights and defenses under the above captioned policy, and all of these rights and defenses are reserved to the Company, whether or not they are specifically mentioned herein.

If you have any questions about this determination please call me.

EXHIBIT

___B___

Sincerely,

Bonnie Dube
Technical Case Management Services
Phone No.: (800) 210-0268 Ext. 38443
Secure Fax No.: (603) 743-4794

Enclosure- February 3, 2005 denial letter

CLOSED

# U.S. District Court
## Northern District of Georgia (Atlanta)
### CIVIL DOCKET FOR CASE #: 1:05-cv-02459-RWS

Everson v. Liberty Mutual Assurance Company
Assigned to: Judge Richard W. Story
 Case: 1:05-cv-02301-RWS
Case in other court:  USCA-11th Circuit, 06-15980-GG
                          USCA - 11th Circuit., 09-10549-HH
Cause: 29:1132 E.R.I.S.A.-Employee Benefits

Date Filed: 09/21/2005
Date Terminated: 01/02/2009
Jury Demand: None
Nature of Suit: 791 Labor: E.R.I.S.A.
Jurisdiction: Federal Question

**Plaintiff**

**Jacqueline Everson**                          represented by   **Jacqueline Everson**
                                                                 1530 Locust Log Way
                                                                 Austell, GA 30168
                                                                 770-739-4963
                                                                 PRO SE

V.

**Defendant**

**Liberty Mutual Assurance Company**            represented by   **H. Sanders Carter , Jr.**
                                                                 Fox Rothschild LLP
                                                                 999 Peachtree Street
                                                                 Suite 1500
                                                                 Atlanta, GA 30309
                                                                 404-962-1015
                                                                 Fax: 404-962-1200
                                                                 Email: scarter@foxrothschild.com
                                                                 *LEAD ATTORNEY*
                                                                 *ATTORNEY TO BE NOTICED*

                                                                 **Andrea K. Cataland**
                                                                 Fox Rothschild, LLP-Atl
                                                                 Suite 2300, Regions Plaza
                                                                 1180 West Peachtree St., N.W.
                                                                 Atlanta, GA 30309
                                                                 404-926-100
                                                                 Fax: 404-962-1200
                                                                 Email: acataland@foxrothschild.com
                                                                 *TERMINATED: 01/09/2008*

                                                                 **Nikole Marie Crow**
                                                                 Womble Bond Dickinson (US) LLP-Atl
                                                                 Suite 2400
                                                                 271 17th Street, NW
                                                                 Atlanta, GA 30363-1017
                                                                 404-872-7000
                                                                 Fax: 404-888-7490

EXHIBIT

____C____

Email: nikole.crow@wbd-us.com
*ATTORNEY TO BE NOTICED*

**Stacia Lynn Guthrie**
Carter & Ansley
1180 West Peachtree Street
2300 Atlantic Center Plaza
Atlanta, GA 30309
404-658-9220
Email: sguthrie@carteransley.com
*(Inactive)*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/21/2005 | 1 | COMPLAINT filed and summon(s) issued. Consent form to proceed before U.S. Magistrate and pretrial instructions given to attorney ( Filing fee $ 250 receipt number 541999.), filed by Jacqueline Everson. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4# 5 Summons# 6 Civil Cover Sheet)(fkt) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 09/22/2005) |
| 10/19/2005 | 2 | Return of Service Executed by Jacqueline Everson. Liberty Mutual Assurance Company served on 9/30/2005, answer due 10/20/2005. (dcs) (Entered: 10/20/2005) |
| 10/20/2005 | 3 | MOTION to Dismiss *Plaintiff's Complaint (Partially)* with Brief In Support by Liberty Mutual Assurance Company. (Attachments: # 1 Memorandum in Support of Defendant's Motion to Partially Dismiss Plaintiff's Complaint# 2 Exhibit 1)(Carter, H.) (Entered: 10/20/2005) |
| 10/26/2005 | 4 | MOTION for Defendant to Answer Claims by Jacqueline Everson. (dcs) (Entered: 10/27/2005) |
| 11/10/2005 |  | Submission of 3 MOTION to Dismiss *Plaintiff's Complaint (Partially)*, submitted to District Judge Charles A. Pannell. (dcs) (Entered: 11/10/2005) |
| 11/10/2005 | 5 | RESPONSE in Opposition re 4 MOTION *for Defendant to Answer Claims* filed by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 11/10/2005) |
| 11/16/2005 | 6 | ORDER - Denying 4 Motion for Miscellaneous Relief. The Court DIRECTS the plaintiff to show cause within tens days as to why the Court should not dismiss counts II and III of her complaint. Signed by Judge Charles A. Pannell on 11/16/05. (dcs) (Entered: 11/16/2005) |
| 11/25/2005 | 7 | Plaintiff's RESPONSE to 3 MOTION to Dismiss *Plaintiff's Complaint (Partially)* filed by Jacqueline Everson. (Attachments: # 1 Exhibit)(dcs) (Entered: 11/29/2005) |
| 12/06/2005 |  | Submission of 6 Order to Show Cause, submitted to District Judge Charles A. Pannell. (dcs) (Entered: 12/06/2005) |
| 12/08/2005 | 8 | ANSWER to Complaint by Liberty Mutual Assurance Company. Discovery ends on 5/8/2006.(Carter, H.) Please visit our website at http://www.gand.uscourts.gov to obtain Pretrial Instructions. (Entered: 12/08/2005) |
| 01/09/2006 | 12 | Initial Disclosures by Jacqueline Everson.(dcs) (Entered: 01/10/2006) |
| 01/09/2006 | 13 | Certificate of Interested Persons by Jacqueline Everson. (dcs) (Entered: 01/10/2006) |
| 01/09/2006 | 14 | PRELIMINARY REPORT AND DISCOVERY SCHEDULE filed by Jacqueline Everson. (dcs) (Entered: 01/10/2006) |

| 01/10/2006 | 9 | Certificate of Interested Persons by Liberty Mutual Assurance Company. (Guthrie, Stacia) (Entered: 01/10/2006) |
|---|---|---|
| 01/10/2006 | 10 | PRELIMINARY REPORT AND DISCOVERY SCHEDULE filed by Liberty Mutual Assurance Company. (Guthrie, Stacia) (Entered: 01/10/2006) |
| 01/10/2006 | 11 | Initial Disclosures by Liberty Mutual Assurance Company. (Attachments: # 1 Attachment A# 2 Attachment B# 3 Attachment C)(Guthrie, Stacia) (Entered: 01/10/2006) |
| 03/22/2006 | 15 | MOTION for Summary Judgment by Jacqueline Everson. (Attachments: (1) Memorandum of Law, (2) Exhibit A)(dfb) --Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.-- (Entered: 03/24/2006) |
| 04/03/2006 | | Case Reassigned to Judge Timothy C. Batten, Sr. (adg) (Entered: 04/03/2006) |
| 04/03/2006 | 16 | NOTICE to Counsel re Case Reassignment to Judge Timothy C. Batten, Sr. (adg) (Entered: 04/03/2006) |
| 04/03/2006 | | Submission of 3 MOTION to Dismiss *Plaintiff's Complaint (Partially)*, 6 Order, submitted to District Judge Timothy C. Batten. (adg) (Entered: 04/03/2006) |
| 04/14/2006 | 17 | Cross MOTION for Summary Judgment with Brief In Support by Liberty Mutual Assurance Company. (Attachments: # 1 Statement of Material Facts # 2 Brief # 3 Exhibit 1# 4 Exhibit 2# 5 Exhibit 4)(Carter, H.) --Please refer to http://www.gand.uscourts.gov to obtain the Notice to Respond to Summary Judgment Motion form contained on the Court's website.-- (Entered: 04/14/2006) |
| 04/14/2006 | 18 | MOTION to Seal *Exhibit 3* by Liberty Mutual Assurance Company. (Attachments: # 1 Text of Proposed Order)(Carter, H.) (Entered: 04/14/2006) |
| 04/14/2006 | 19 | MOTION for Leave to File Excess Pages with Brief In Support by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 04/14/2006) |
| 04/14/2006 | 20 | Exhibit 3 in support of Defendant's 17 Cross MOTION for Summary Judgment filed by Liberty Mutual Assurance Company. (---FILED UNDER SEAL---) (mas) (Additional attachment(s) added on 3/27/2015: # 1 Exhibit 3-1) (kdw). (Entered: 04/17/2006) |
| 04/14/2006 | 21 | RESPONSE in Opposition to Plaintiff's 15 MOTION for Summary Judgment filed by Liberty Mutual Assurance Company. (located within Defendant's 17 Cross Motion) (mas) (Entered: 04/17/2006) |
| 04/18/2006 | 22 | ORDER granting 18 Motion to Seal Exhibit 3. Signed by Judge Timothy C. Batten Sr. on 4/17/06. (mas) (Entered: 04/18/2006) |
| 04/21/2006 | | Submission of 15 MOTION for Summary Judgment, submitted to District Judge Timothy C. Batten. (mas) (Entered: 04/21/2006) |
| 05/02/2006 | 23 | RESPONSE in Opposition to Defendant's 17 Cross MOTION for Summary Judgment filed by Jacqueline Everson. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 certificate of service)(mas) (Entered: 05/05/2006) |
| 05/08/2006 | | Submission of 19 MOTION for Leave to File Excess Pages, 17 Cross MOTION for Summary Judgment, submitted to District Judge Timothy C. Batten. (mas) (Entered: 05/08/2006) |
| 05/12/2006 | 24 | PROPOSED ORDER permitting defendant to file its consolidated memorandum of law in opposition to plaintiff's motion for summary judgment and in support of its cross-motion for summary judgment that is 27 pages in length re: 19 MOTION for Leave to File Excess Pages. (Carter, H.) (Entered: 05/12/2006) |

| | | |
|---|---|---|
| 05/16/2006 | 25 | ORDER granting 19 Motion for Leave to File Excess Pages. Signed by Judge Timothy C. Batten Sr. on 5/15/06. (mas) (Entered: 05/16/2006) |
| 05/16/2006 | 26 | MOTION for Default Judgment as to Liberty Mutual Assurance Company by Jacqueline Everson. (Attachments: # 1 Affidavit # 2 Exhibit A# 3 Exhibit B# 4 proposed order)(mas) (Entered: 05/16/2006) |
| 05/19/2006 | 27 | REPLY BRIEF re 17 Cross MOTION for Summary Judgment filed by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 05/19/2006) |
| 05/22/2006 | 28 | NOTICE of Appearance by Stacia Lynn Guthrie on behalf of Liberty Mutual Assurance Company (Guthrie, Stacia) (Entered: 05/22/2006) |
| 05/22/2006 | 29 | STRICKEN per Order filed 11/2/2006 RESPONSE to Defendant's 17 Cross MOTION for Summary Judgment filed by Jacqueline Everson. (Attachments: # 1 Affidavit # 2 Exhibit A)(mas) Modified on 11/2/2006 (sjk). Additional attachment(s) added on 11/3/2006 (sjk). (Entered: 05/23/2006) |
| 05/30/2006 | 30 | RESPONSE in Opposition re 26 MOTION for Default Judgment as to Liberty Mutual Assurance Company filed by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 05/30/2006) |
| 06/13/2006 | 31 | MOTION to Strike 29 Response to Motion with Brief In Support by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 06/13/2006) |
| 06/15/2006 | | Submission of 26 MOTION for Default Judgment as to Liberty Mutual Assurance Company, submitted to District Judge Timothy C. Batten. (mas) (Entered: 06/15/2006) |
| 06/19/2006 | 32 | RESPONSE to Defendant's 31 MOTION to Strike filed by Jacqueline Everson. (mas) (Entered: 06/20/2006) |
| 07/06/2006 | | Submission of 31 MOTION to Strike 29 Response to Motion, submitted to District Judge Timothy C. Batten. (mas) (Entered: 07/06/2006) |
| 10/02/2006 | 33 | ORDER OF RECUSAL. Judge Timothy C. Batten, Sr recused. Case reassigned to Judge Richard W. Story for all further proceedings. Signed by Judge Timothy C. Batten Sr. on 10/2/2006. (adg) (Entered: 10/03/2006) |
| 10/03/2006 | 34 | NOTICE to Counsel re: 33 Order of Recusal, case reassigned to Judge Richard W. Story. (adg) (Entered: 10/03/2006) |
| 10/03/2006 | | Submission of 3 MOTION to Dismiss *Plaintiff's Complaint (Partially)*, 15 MOTION for Summary Judgment, 17 Cross MOTION for Summary Judgment, 26 MOTION for Default Judgment as to Liberty Mutual Assurance Company, 31 MOTION to Strike 29 Response to Motion,submitted to District Judge Richard W. Story. (adg) (Entered: 10/03/2006) |
| 10/10/2006 | 35 | ORDER GRANTING 3 Motion to Partially Dismiss Plaintiff's 1 Complaint and DENYING Plaintiff's 26 Motion for Default Judgment. Signed by Judge Richard W. Story on 10/10/2006. (sjk) (Entered: 10/11/2006) |
| 11/02/2006 | 36 | ORDER DENYING Plaintiff's 15 Motion for Summary Judgment, DENYING Defendant's 17 Cross-Motion for Summary Judgment, and GRANTING Defendant's 31 Motion to Strike 29 Response to Motion. Signed by Judge Richard W. Story on 11/2/2006. (sjk) (Entered: 11/02/2006) |
| 11/09/2006 | 37 | NOTICE OF APPEAL as to 36 Order on Motion to Strike, Order on Motion for Summary Judgment by Jacqueline Everson. Filing fee $ 455.00, receipt number 558060. Transcript Order Form due on 11/27/2006. (Attachments: # 1 Notice Of Appeal Pt. 2# 2 Appeal Fee Receipt)(cc:USCA)(pjm) (Entered: 11/13/2006) |

| | | |
|---|---|---|
| 11/09/2006 | 39 | TRANSCRIPT ORDER FORM re: 37 Notice of Appeal. Certificate of Readiness due on 11/27/2006. (No transcript ordered) (pjm) (Entered: 11/13/2006) |
| 11/09/2006 | 40 | Factual OBJECTION re 36 Order filed by Jacqueline Everson. (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D)(sjk) (Entered: 11/13/2006) |
| 11/13/2006 | 38 | Transmission of Certified Copy of Notice of Appeal, USCA Appeal Fee Receipt, Order and Docket Sheet to US Court of Appeals re: 37 Notice of Appeal. (pjm) (Entered: 11/13/2006) |
| 11/17/2006 | 41 | USCA Acknowledgment of 37 Notice of Appeal filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 06-15980-GG. (pjm) (Entered: 11/20/2006) |
| 11/17/2006 | 42 | DOCUMENT FILED IN ERROR USCA Acknowledgment re: 37 Notice of Appeal filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 06-15865-BB. (pjm) Modified on 11/20/2006 (pjm). (Entered: 11/20/2006) |
| 11/29/2006 | | CERTIFICATE OF READINESS of Appeal Record re: 37 Notice of Appeal filed by Jacqueline Everson. USCA Case Number 06-15980-GG. (3 Vols of Pldgs w/ 1 filed under SEAL) (pjm) (Entered: 11/29/2006) |
| 11/29/2006 | 43 | Certified copy of CERTIFICATE OF READINESS transmitted to USCA re: 37 Notice of Appeal. Case Appealed to USCA-11th Circuit. Case Number 06-15980-GG. (pjm) (Entered: 11/29/2006) |
| 12/04/2006 | 44 | USCA Acknowledgment of Certificate of Readiness re: 37 Notice of Appeal filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 06-15980-GG. (pjm) (Entered: 12/05/2006) |
| 12/15/2006 | 45 | Certified copy of USCA ORDER DISMISSING 37 Notice of Appeal for lack of jurisdiction filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 06-15980-GG. (pjm) (Entered: 12/19/2006) |
| 03/20/2007 | 46 | Request for Leave of Absence for the following date(s): March 19, 20, 21, 22, 23, 24, 28, 29, and 30, 2007, and May 2, 3, 4, 5, 6, 7, 8, 9, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, and 26, 2007, by H. Sanders Carter, Jr. (Carter, H.) (Entered: 03/20/2007) |
| 03/20/2007 | | NOTICE of Undeliverable Electronic Mail re: 46 Leave of Absence. Mail returned for Stacia Lynn Guthrie due to no longer being employed with firm. (aar) (Entered: 03/20/2007) |
| 05/11/2007 | 47 | NOTICE of Change of Address for H. Sanders Carter, Jr, counsel for Liberty Mutual Assurance Company (Carter, H.) (Entered: 05/11/2007) |
| 05/21/2007 | 48 | Request to the Judge for a Response to Plaintiff's 40 Factual Objection by Jacqueline Everson. (rth) (Entered: 05/22/2007) |
| 05/30/2007 | 49 | RESPONSE re 48 Request to the Judge for a Response to Plaintiff's 40 Factual Objection by Liberty Mutual Assurance Company. (Carter, H.) Modified on 6/13/2007 (sjk). (Entered: 05/30/2007) |
| 06/13/2007 | | Submission of 48 MOTION to the Judge for a Response 40 Objection to District Judge Richard W. Story. (sjk) (Entered: 06/13/2007) |
| 06/15/2007 | 50 | ORDER GRANTING 48 Request for a Response to Plaintiff's Factual Objection, which the Court construes as a motion for reconsideration, which Motion is hereby DENIED. Signed by Judge Richard W. Story on 6/15/2007. (sjk) (Entered: 06/15/2007) |
| 08/07/2007 | 51 | Proposed Pretrial Order by Jacqueline Everson, Liberty Mutual Assurance Company. (Carter, H.) (Entered: 08/07/2007) |

| 08/07/2007 | 52 | Joint MOTION for Settlement *Conference* by Jacqueline Everson, Liberty Mutual Assurance Company. (Carter, H.) (Entered: 08/07/2007) |
|---|---|---|
| 08/08/2007 | 53 | ORDER GRANTING the 52 Joint Motion for Settlement Conference. The Court refers the matter to Chief Magistrate Judge Gerrilyn G. Bill for the selection of a Magistrate Judge as mediator. Signed by Judge Richard W. Story on 8/8/07. (dfb) (Entered: 08/10/2007) |
| 08/10/2007 | | CASE REFERRED to Magistrate Judge E. Clayton Scofield III for mediation. (dfb) (Entered: 08/10/2007) |
| 09/06/2007 | 54 | ORDER scheduling Mediation.Mediation Hearing set for 9/14/2007, at 10:00 AM in Courtroom 1810 before Judge E. Clayton Scofield III. Signed by Judge E. Clayton Scofield III on 9/6/2007. (sjk) (Entered: 09/06/2007) |
| 09/14/2007 | 55 | Minute Entry for proceedings held before Judge E. Clayton Scofield III: Mediation on 9/14/2007. (Tape number not provided.)(sjk) (Entered: 09/14/2007) |
| 10/12/2007 | 56 | Joint PRETRIAL ORDER. Signed by Judge Richard W. Story on 10/12/2007. (sjk) (Entered: 10/15/2007) |
| 10/15/2007 | 57 | MOTION to Recuse Judge Richard W. Story by Jacqueline Everson. (sjk) (Entered: 10/16/2007) |
| 11/01/2007 | 58 | RESPONSE re 57 MOTION for Recusal filed by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 11/01/2007) |
| 11/14/2007 | | Submission of 57 MOTION to Recuse Judge Richard W. Story to District Judge Richard W. Story. (sjk) (Entered: 11/14/2007) |
| 11/29/2007 | 59 | NOTICE of Appearance by Andrea K. Cataland on behalf of Liberty Mutual Assurance Company (Cataland, Andrea) (Entered: 11/29/2007) |
| 12/28/2007 | 60 | Petition for Leave of Absence for the following date(s): 1/17-20, 2008; 2/10-3/7/2008; 4/23-26, 2008; 5/14-16, 2008; and 5/18-21, 2008 , by H. Sanders Carter, Jr.(Attachments: # 1 Text of Proposed Order)(Carter, H.) Modified on 1/2/2008 to correct text to more accurately reflect e-filed document (sjk). (Entered: 12/28/2007) |
| 01/03/2008 | 61 | ORDER APPROVING 60 Petition for Leave of Absence. Signed by Judge Richard W. Story on 1/3/2008. (sjk) (Entered: 01/03/2008) |
| 01/09/2008 | 62 | Certification of Consent to Substitution of Counsel. Nikole Marie Crow replacing attorney Andrea K. Cataland. (Crow, Nikole) (Entered: 01/09/2008) |
| 03/06/2008 | | Case no longer referred to Magistrate Judge E. Clayton Scofield, III for settlement as per 55 Settlement Conference. (fmm) (Entered: 03/06/2008) |
| 04/14/2008 | 63 | ORDER DENYING 57 Motion for Recusal. Signed by Judge Richard W. Story on 4/14/2008. (sjk) (Entered: 04/14/2008) |
| 04/21/2008 | 65 | DOCUMENT FILING ERROR. FILED IN WRONG CASE. DEPOSITION of JACQUELINE HUFF taken on 2/21/2008 by Liberty Mutual Assurance Company.(sjk) Modified on 4/23/2008 (sjk). (Entered: 04/23/2008) |
| 04/22/2008 | 64 | MOTION to be Added to Court Calendar by Jacqueline Everson. (sjk) (Entered: 04/23/2008) |
| 04/23/2008 | | Notification of Docket Correction re 65 Deposition. This document was entered in this case in error. (sjk) (Entered: 04/23/2008) |
| 05/08/2008 | 66 | RESPONSE in Opposition re 64 MOTION for Trial filed by Liberty Mutual Assurance |

| | | Company. (Crow, Nikole) (Entered: 05/08/2008) |
|---|---|---|
| 05/29/2008 | | Submission of 64 MOTION to be Added to Court Calendar to District Judge Richard W. Story. (sjk) (Entered: 05/29/2008) |
| 08/07/2008 | 67 | NOTICE of Change of Address for H. Sanders Carter, Jr, counsel for Liberty Mutual Assurance Company (Carter, H.) (Entered: 08/07/2008) |
| 10/02/2008 | 68 | ORDER GRANTING 64 MOTION for Case to be Added to a Court Calendar. This case is set down for a non-jury trial beginning 12/15/2008, at 9:00 AM in Courtroom 2105 before Judge Richard W. Story. Signed by Judge Richard W. Story on 10/2/2008. (sjk) (Entered: 10/02/2008) |
| 10/02/2008 | | Clerk's Certificate of Mailing as to Jacqueline Everson re 68 Order. (sjk) (Entered: 10/02/2008) |
| 11/14/2008 | 69 | NOTICE setting Trial: Bench Trial set for 12/15/2008 at 09:30 AM in ATLA Courtroom 2105 before Judge Richard W. Story. (rag) (Entered: 11/14/2008) |
| 11/14/2008 | | Clerks Certificate of Mailing as to Jacqueline Everson re 69 Notice setting Trial (rag) (Entered: 11/14/2008) |
| 11/25/2008 | 70 | MOTION for Trial *on the Papers* with Brief In Support by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 11/25/2008) |
| 12/01/2008 | 71 | ORDER, resetting Bench Trial set for 12/16/2008, at 9:00 AM in Courtroom 2105 before Judge Richard W. Story. Signed by Judge Richard W. Story on 12/1/2008. (sjk) (Entered: 12/01/2008) |
| 12/01/2008 | | Clerk's Certificate of Mailing as to Jacqueline Everson re 71 Order. (sjk) (Entered: 12/01/2008) |
| 12/10/2008 | 72 | ORDER DENYING 70 Motion for Trial on the Papers. Signed by Judge Richard W. Story on 12/10/2008. (sjk) (Entered: 12/10/2008) |
| 12/10/2008 | | Clerk's Certificate of Mailing as to Jacqueline Everson re 72 Order on Motion for Trial. (sjk) (Entered: 12/10/2008) |
| 12/11/2008 | 73 | MOTION in Limine to Exclude Evidence Outside the Administrative Record *, or Alternatively*, MOTION to Amend *the Pre-Trial Order* with Brief In Support by Liberty Mutual Assurance Company. (Attachments: # 1 Exhibit A)(Crow, Nikole) (Entered: 12/11/2008) |
| 12/12/2008 | 74 | ORDER ALLOWING AUDIO/VISUAL EQUIPMENT IN THE COURTROOM. Signed by Judge Richard W. Story on 12/12/2008. (sjk) (Entered: 12/12/2008) |
| 12/12/2008 | | Clerk's Certificate of Mailing as to Jacqueline Everson re 74 Order Allowing Audio/Visual Equipment in the Courtroom. (sjk) (Entered: 12/12/2008) |
| 12/16/2008 | 75 | ORDER GRANTING 73 Motion in Limine. Signed by Judge Richard W. Story on 12/15/2008. (sjk) (Entered: 12/16/2008) |
| 12/16/2008 | | Clerk's Certificate of Mailing as to Jacqueline Everson re 75 Order on Motion in Limine, Order on Motion to Amend. (sjk) (Entered: 12/16/2008) |
| 12/16/2008 | 76 | Minute Entry for proceedings held before Judge Richard W. Story: Bench Trial begun on 12/16/2008, Bench Trial concluded on 12/16/2008. Trial Completed - Submitted to Court. (Court Reporter Donna Keeble)(vs) (Entered: 12/17/2008) |
| 01/02/2009 | 77 | FINDINGS OF FACT AND CONCLUSIONS OF LAW. The Clerk is DIRECTED to ENTER JUDGMENT in favor of Defendant and against Plaintiff. Signed by Judge |

| | | Richard W. Story on 1/2/09. (dfb) (Entered: 01/02/2009) |
|---|---|---|
| 01/02/2009 | 78 | CLERK'S JUDGMENT in favor of Defendant against Plaintiff. (dfb)--Please refer to http://www.ca11.uscourts.gov to obtain an appeals jurisdiction checklist-- (Entered: 01/02/2009) |
| 01/02/2009 | | Clerk's Certificate of Mailing as to Jacqueline Everson re: 77 Findings of Fact & Conclusions of Law, 78 Clerk's Judgment. (dfb) (Entered: 01/02/2009) |
| 01/02/2009 | | Civil Case Terminated. (dfb) (Entered: 01/02/2009) |
| 01/20/2009 | 79 | TRANSCRIPT of Proceedings held on 12/16/08 (Bench Trial) before Judge Richard W. Story. Court Reporter/Transcriber Donna C. Keeble, Telephone number 404-215-1383. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/10/2009. Redacted Transcript Deadline set for 2/20/2009. Release of Transcript Restriction set for 4/20/2009. (Attachments: # 1 Notice of Filing Transcript) (pjm) (Entered: 01/27/2009) |
| 01/30/2009 | 80 | BILL OF COSTS by Liberty Mutual Assurance Company. (Carter, H.) (Entered: 01/30/2009) |
| 02/02/2009 | 81 | Costs Taxed in amount of $ 1,284.68 against Jacqueline Everson. (ekb) (Entered: 02/02/2009) |
| 02/02/2009 | | Clerks Certificate of Mailing as to Jacqueline Everson re 81 Costs Taxed (ekb) (Entered: 02/02/2009) |
| 02/03/2009 | 82 | NOTICE OF APPEAL as to 78 Clerk's Judgment and 77 Findings of Fact & Conclusions of Law by Jacqueline Everson. Filing fee $ 455.00, receipt number GAN100008871. Transcript Order Form due on 2/18/2009. (Attachments: # 1 USCA Appeal Fees)(pjm) (Entered: 02/03/2009) |
| 02/03/2009 | 83 | TRANSCRIPT ORDER FORM (No transcript requested) re: 82 Notice of Appeal. Certificate of Readiness due on 2/18/2009. (pjm) (Entered: 02/03/2009) |
| 02/03/2009 | 84 | Transmission of Certified Copy of Notice of Appeal, USCA Appeal Fees, Judgment, Order and Docket Sheet to US Court of Appeals re: 82 Notice of Appeal. (pjm) (Entered: 02/03/2009) |
| 02/10/2009 | 85 | USCA Acknowledgment of 82 Notice of Appeal filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 09-10549-HH. (pjm) (Entered: 02/11/2009) |
| 02/12/2009 | | CERTIFICATE OF READINESS of Appeal Record re: 82 Notice of Appeal filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 09-10549-HH. (4 Vols of Pldgs w/1 filed under SEAL and 1 Transcript) (pjm) (Entered: 02/12/2009) |
| 02/12/2009 | 86 | Certified copy of CERTIFICATE OF READINESS transmitted to USCA re: 82 Notice of Appeal. Case Appealed to USCA-11th Circuit. Case Number 09-10549-HH. (pjm) (Entered: 02/12/2009) |
| 02/19/2009 | 87 | USCA Acknowledgment of Certificate of Readiness re: 82 Notice of Appeal filed by Jacqueline Everson. Case Appealed to USCA-11th Circuit. Case Number 09-10549-HH. (pjm) (Entered: 02/23/2009) |
| 03/20/2009 | 88 | Certified copy of USCA ORDER DISMISSING 82 Notice of Appeal filed by Jacqueline Everson for lack of jurisdiction. Case Appealed to USCA-11th Circuit. Case Number 09-10549-HH. (pjm) (Entered: 03/23/2009) |

| 10/22/2009 | 89 | Appeal notice from USCA notifying the U.S. District Court, Clerk of Court, that the United States Supreme Court has DENIED the Petitioner's Writ of Certiorari re: 82 Notice of Appeal. Case Appealed to USCA - 11th Circuit. USCA Case Number 09-10549-HH. (kac) (Entered: 10/26/2009) |

| PACER Service Center | | |
| --- | --- | --- |
| Transaction Receipt | | |
| 07/26/2023 18:38:36 | | |
| **PACER Login:** | irademaekers | **Client Code:** | Lincoln |
| **Description:** | Docket Report | **Search Criteria:** | 1:05-cv-02459-RWS |
| **Billable Pages:** | 7 | **Cost:** | 0.70 |

ORIC'

FILED IN CLERK'S OFFICE

SEP 2 1 2005

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

LUTHER D. THOMAS, Clerk

By: _____ Deputy Clerk

| | | |
|---|---|---|
| JACQUELINE EVERSON, | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| v | ) | **1:05-CV-2459** CAP |
| | ) | |
| Liberty Mutual Assurance Company, | ) | CIVIL ACTION NO _____ |
| | ) | |
| Defendants | ) | |

PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Jacqueline Everson hereby files her original complaint and states

JURISDICTION

1    This Court has subject matter jurisdiction under the Employee Retirement Income and Security Act of 1974, 29 U S C  §§ 1001 et seq ("ERISA")

2    The long term disability plan (the "Plan") at issue is an employee benefit plan, as that term is defined in ERISA § 3(3), 29 U S C  § 1002(3)

3    Plaintiff is a "participant" under the plan, as that term is defined in ERISA §3(7), 29 U S C  § 1002(7), and Plaintiff seeks compensatory relief akin to that available under ERISA § 502, 29 U S C § 1132

4    Venue is proper pursuant to 28 U S C  § 1331 and ERISA § 502(e), 29 U S C  § 1132(e)

FORMS RECEIVED
Consent To US Mag
Pretrial Instructions
Title VII NFC

EXHIBIT
D

- 1 -

PARTIES

5    Plaintiff Jacqueline Everson is a citizen of the United States and a residence of Austell, Cobb County, Georgia   She is 47 years old   Plaintiff was employed, and paid long-term disability premiums in Fulton County, Georgia

6    At all times relevant to this lawsuit, plaintiff was approved for, and received long-term disability payments from Liberty Mutual Insurance Company "Defendant", March 5. 2004 until March 29, 2005   Most recently, until her disability benefits were unjustly terminated

7    Plaintiff paid a premium to The Coca-Cola Company ("TCCC"), located in Fulton County, Georgia for disability benefits administered by defendant Liberty   Plaintiff became disabled in August 2003   Plaintiff was Sr   Finance Analyst, and provided excellent service to TCCC from 1988-2003

8    Defendant administers disability benefits for TCCC located in Fulton County, Georgia.   Therefore, defendant derives substantial revenue from services in Fulton County, in the state of Georgia   Defendant engages in regular communications, with the state of Georgia. thru documentation which includes emails regarding benefits paid to disabled employees, to TCCC, and all are located in the State of Georgia.   Therefore, defendant has established a direct business relationship between Defendant, and The United States District Court, Northern District of Georgia, Atlanta Division

9    The defendant may be served with process by delivering a copy of the Summons and Complaint to its registered agent for service, Liberty Mutual Assurance Company, P O  Box 1525, Dover, New Hampshire 03821

-2-

## STATEMENT OF FACTS SUMMARY

10   The defendant used unfair tactics to terminate disability payments, when plaintiff told defendant her condition had deteriorated

11.   Plaintiff's attending physician provided documented medical evidence to the defendant reflecting plaintiff's condition since the onset of her disability in August 2003

12   Plaintiff's attending physician provided medical test(s) results and documentation to defendant in support of plaintiff's initial approval for disability payments in March 2004

13   Defendant refused to acknowledge medical evidence confirming plaintiff's condition progressively deteriorated, after she was approved for disability payments in 2004

14   Defendant refused to acknowledge the medical evidence from plaintiff's attending physician prior to termination of plaintiff's disability payments

15   Defendant engaged in an unfair act of disregard for the attending physician's authority over patient's disability, and accepted the opinion of one Independent Medical Examiner seen for only 10-15 minutes

16   Defendant terminated the plaintiff's benefits without regard for medical tests, and evaluations from three physicians confirming severe results

17   All three test and evaluations were performed after defendant approved plaintiff for disability payments

18   All three test and evaluations were performed before defendant terminated plaintiff's disability payments

19   Plaintiff filed a written request for appeal within the 180 days allowed by the defendant

20   Defendant's notice to plaintiff states, The claim will remain closed and no further communication or correspondence will be addressed

(a) Plaintiff paid a premium for long-term disability benefits
(b) Plaintiff became disabled with severe cervical spine radiculopathy,
in August 2003   (c) Defendant starts paying benefits six months after
disability onset date   (d) Defendant approved plaintiff for disability
payments effective March 5, 2004   (e) Defendant terminated plaintiff's
disability payments March 29, 2005   (f) Plaintiff has the same attending
physician since 2002   (g) Plaintiff's attending physician provided
defendant with on-going medical exam documentation, independent medical
testing, and independent medical consultation, as evidence in support of
her severe medical condition, and progressive deterioration   (h)
Plaintiff's attending physician reported, physical exam findings, as well
as imaging and electromyography with nerve conduction velocity studies
all support a diagnosis of chronic, severe, cervical spine radiculopathy
(i) Plaintiff has provided defendant with results of an MRI test that
confirmed flattening of the spinal cord   (j) Plaintiff has provided
defendant with results of an EMG test confirming muscle(s) atrophy,
bilateral and mid cervical radiculopathies   (k) Plaintiff's attending
physician has rendered her totally and permanently disabled

### Count I.  Wrongful Termination of Disability Payments
Summary  Defendant failed to render a fair decision based on
medical evidence

21   Defendant engaged in an unfair act of disregard for the
attending physician's authority over patient's disability, and accepted
the opinion of one Independent Medical Examiner seen for only 10-15
minutes
22   Defendant terminated the plaintiff's benefits without regard
for medical tests, and evaluations from three physicians confirming
severe results
23   All three test and evaluations were performed after
defendant approved plaintiff for disability payments
24   All three test and evaluations were performed before
defendant terminated plaintiff's disability payments

- 4 -

25   Plaintiff's attending physician is Dr. Steven Stewart

26   Plaintiff has been rendered totally and permanently disabled by her attending physician

27   Plaintiff's appointment with attending physician is every two months   Plaintiff's next appointment is September 26, 2005

28   Plaintiff continues to require medical care and medications

### Plaintiff's list of physicians, used by defendant in the initial approval for plaintiff's disability payments beginning on March 5, 2004

| Physician | Number of Visits | Date of last visit |
|---|---|---|
| - Dr  Steven Stewart | approx  15 | July 25, 2005 |
| - Dr  Jon Hyman | 2 | August 11, 2003 |
| - Dr  Cone-Sullivan | 3 | September 18, 2003 |
| - Dr  Howard Levy | 1 | November 6, 2003 |
| - Dr  John Heller | 1 | January 20, 2004 |

### Plaintiff's list of physicians, used by defendant to terminate plaintiff's disability payments

| Physician | Number of Visits | Date of last visit |
|---|---|---|
| - Dr  Steven Stewart | approx  15 | July 25, 2005 |
| - Dr. David Gower | 1 | April 14, 2004 |
| - Dr. Ralph D'Auria | 1 | December 13, 2004 (*) (defendant's IME) |
| - Dr  Jacqueline Washington | 2 | December 21, 2004 |

29   Defendant sent plaintiff for one independent medical exam on December 13, 2004 (*)   Defendant's decision is based on <u>one</u> opinion

30   Defendant's decision to terminate plaintiff's disability payments was based on one (*) physician's exam, which lasted only 10-15 minutes

31   Plaintiff's attending physician referred her to six medical specialists for testing and evaluation

32   Six medical specialist have provided their medical findings and reports to the plaintiff's attending physician

33   Plaintiff's attending physician documented that physical exam findings, as well as imaging and electromyography with nerve conduction velocity studies all support a diagnosis of chronic, severe, cervical spine radiculopathy

34   Testing and evaluations have provided evidence that the plaintiff's condition has progressively deteriorated since the onset of her disability in 2003  * Muscle atrophy (loss) is physical evidence of progressive deterioration   Defendant refused to acknowledge evidence

35   All medical documentation was provided to the defendant as required by guidelines. * Attached are "post" approval medical reports

36   Plaintiff seeks compensatory relief akin to that available under ERISA § 502, 29 U S C  § 1132

### Count II   Negligent Supervision

37   Plaintiff repeat and re-allege each and every allegation above as if set forth herein paragraphs 1-36

38   Defendant knew, or reasonably should have known, that Plaintiff's disability claim supervisor was engaging in the unlawful behavior described herein above

39   At all times material herein, Defendant knew, or reasonably should have known, that the above violated plaintiff's rights

40   At all times material herein, Defendant knew, or reasonably should have known, that the incidents, conduct, acts and failures to act of all supervisors, agents and employees as described herein above violated plaintiff's rights

41.   At all times material herein, Defendant knew, or reasonably should have known, that the incidents, conduct, acts and failure to act described herein above, would and did proximately result in the injury to plaintiff, including, but not limited to, economic loss and the loss of benefits of her employment

42   At all times material herein, defendant knew, or in the exercise of reasonable care should have known, that unless Defendant intervened to protect plaintiff and to adequately supervise, prohibit, control, regulate, discipline, and/or otherwise penalize the conduct, acts and failures to act, of all supervisors, agents or employees as alleged, herein above, said conduct, acts and failure to act would continue, thereby subjecting plaintiff to economic loss and other injury

43   Defendant knew, or in the exercise of reasonable care should have known, that unless defendant intervened to protect Plaintiff, and to adequately supervise, prohibit, control, regulate, discipline, and/or otherwise penalize the conduct, acts and failures to act of the employees, agents and supervisors and others as described herein, defendant's failure to so protect, supervise and intervene would have the effect of encouraging, ratifying, condoning, exacerbating, increasing and worsening said conduct, acts and failures to act

44   At all times material herein, defendant has the power, ability, authority and duty to so intervene, supervise, prohibit, control, regulate, discipline and/or penalize the conduct of all supervisors, agents or employees as described herein above

- 7 -

45   Despite said knowledge, power and duty, Defendant negligently failed to act so as to prevent supervise, prohibit, control, regulate, discipline, and/or penalize such conduct, acts and failures to act, or to otherwise protect plaintiff

46   As a direct and proximate result of the failure of defendant to protect plaintiff and to adequately supervise, prohibit, control, regulate, discipline, and/or otherwise penalize the conduct, acts and failures to act of supervisors, agents or employees as alleged herein above, said conduct, acts, and failures to act of supervisors, agents or employees violated plaintiff's rights

47   Defendant's conduct as described herein was malicious and oppressive, and done with conscious disregard of plaintiff's rights

48   The acts of Defendant were performed with the knowledge of a companies economic power over its individual insured policy holders Defendant, through its officers, managing agents and/or supervisors, authorized, condoned and ratified the unlawful

49   Defendant documented that plaintiff's claim will remain closed and no further communication or correspondence will be addressed

50   Defendant forced plaintiff to take legal action

51   Plaintiff seeks compensatory relief akin to that available under ERISA § 502, 29 U S C  § 1132

### Count III.  Disparate Impact

52   Plaintiff repeat and re-allege each and every allegation above as if set forth herein paragraph 1-51

53   Defendant's conduct, as described herein, was malicious and oppressive, and done with a conscious disregard of plaintiff's rights

54    The acts of defendant were performed with the knowledge of a company's economic power over individual insured citizens

55    Defendant has maliciously and intentionally engaged in outrageous conduct against the plaintiff

56    Plaintiff Jacqueline Everson has suffered extreme emotional distress as the result of the willful, malicious, and intentional acts of defendant   Defendant threatened and finally terminated the plaintiff disability payments without a thorough and just evaluation

57    As a result of Defendants' actions, plaintiff and her family have suffered injury, including financial loss of disability income, emotional pain, humiliation, inconvenience, and mental anguish

58    These facts prove one thing, if nothing else   Defendant has displayed an unlawful disregard for the rights of plaintiff

59    Defendant has displayed a willingness to condone misconduct when it comes to its employees

60    Defendant has unlawfully terminated plaintiff disability payments, forcing her to file a lawsuit

### Count IV   Fees and Costs

61    Plaintiff re-alleges and incorporate by reference paragraphs 1-60 with the same force and effect as if fully set out in specific detail herein below

62    The defendant has acted in bad faith, and has caused plaintiff unnecessary trouble and expense

63    Plaintiff is entitled to disability benefits until age 65 as stated in the long-term disability terms and conditions provided by defendant

64    Plaintiff seeks compensatory relief akin to that available under ERISA § 502, 29 U S C  § 1132

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays that this Court assume jurisdiction of this action

a    Issue a declaratory judgment holding that the actions of the defendants violated the rights of plaintiff under Georgia law

b    Enter an order requiring the defendants to make plaintiff whole by awarding plaintiff equitable, cost to include legal fees, expenses, and pre-judgment and post-judgment interest applicable

c    Plaintiff further prays for such other relief and benefits as the cause of justice may require

RESPECTFULLY SUBMITTED,

JACQUELINE EVERSON
1530 Locust Log Way
Austell, Georgia  30168
Tel  770-739-4963

- 10 -

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

JACQUELINE EVERSON,

    Plaintiff,

    v.

LIBERTY MUTUAL
ASSURANCE COMPANY,

    Defendant.

:
:
:
:
:
:
:
:
:
:
:

CIVIL ACTION NO.
1:05-CV-2459-RWS

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Jacqueline Everson, proceeding *pro se*, initiated this action on September 21, 2005, against Defendant Liberty Mutual Assurance Company ("Liberty"). In her original Complaint, Plaintiff alleged wrongful termination of her disability benefits under the Employment Retirement Income Security Act of 1974 ("ERISA"), see 29 U.S.C. § 1002(1), and several related claims arising under state law. (See Pl.'s Original Complaint [1-1] [hereinafter "Compl."].) In an Order dated October 10, this Court dismissed Plaintiff's state law claims, leaving intact only Plaintiff's claim under ERISA. (See Order of

EXHIBIT

**E**

AO 72A
(Rev.8/82)

October 10, 2006 [35] at 1-4.)  By Order dated November 2, 2006 [36], the Court denied both parties' motions for summary judgment.[1]

This case then came before the Court for trial on December 16, 2008. After considering the evidence presented at trial and the arguments of Ms. Everson and defense counsel, the Court enters the following Findings of Fact and Conclusions of Law.

## Findings of Fact

### I.   The Parties

1.   Plaintiff Jacqueline Everson is a 50-year-old female and a former employee of The Coca-Cola Company.

2.   Defendant Liberty Life Assurance Company of Boston ("Liberty"), sued as "Liberty Mutual Assurance Company," is a company which sells and administers group plans for long-term disability benefits.

### II.   The Policy

3.   At all times relevant to this action, Liberty was under a contract,

---

[1] The procedural posture of this case is fully reported in this Court's Order of October 10, 2006 and Order of November 2, 2006.

2

identified as Group Policy No. GF3-850-281390-01 (the "Plan"), with Coca-Cola to provide group long-term disability income insurance to Coca-Cola's covered employees within the meaning of section 3(1) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1002(1). (Def. Ex. 1.) At all times relevant to this action, Plaintiff was a covered employee.

4.    Under the Plan, "Disabled" is defined as a condition in which in the first two years "the Covered Person, as a result of Injury or Sickness, is unable to perform the Material and Substantial Duties of his Own Occupation; and [two years] thereafter, the Covered Person is unable to perform, with reasonable continuity, the Material and Substantial Duties of Any Occupation." The parties do not dispute that, because the Plaintiff's disability benefits were terminated within two years after they were commenced, the controlling provision in this case respects Plaintiff's ability to perform the material duties of her "Own Occupation," and not "Any Occupation."

3

5.      The Plan also defines "Injury" as "bodily impairment resulting directly from an accident and independently of all other causes," and defines "Sickness" as "illness, disease, pregnancy or complications of pregnancy."

6.      The Plan further provides that "Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder."

7.      The Plan also authorized Liberty to require medical examinations or other evaluations as part of its review of a claim for benefits:

> Liberty, at its own expense, may have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty. This right may be used as often as reasonably required.

(Def. Ex. 1.)

## III.  Plaintiff's Occupation

8.      Plaintiff became employed by Coca-Cola in 1988 (See Def. Ex. 2, p. 422.)  In 2003, her job title was Senior Financial Analyst, described as a "desk job" with most of the day spent "working on a

4

computer, with some time in meetings and on the phone." (Id. at 339.)

9.    Liberty received a Physical Job Evaluation Form from Coca-Cola describing Plaintiff's occupational duties. (See id. at 339.) In this report, the manager of Plaintiff's work-group stated that Plaintiff's occupational duties required seven to eight hours of sitting, zero to one hour of standing, four to six hours of reaching while working at a computer, repetitive movements on a keyboard, and four to six hours of fine finger dexterity. (Id.)

## IV.    Plaintiff's Claim and the Cessation of Benefits

### A.    Plaintiff's Medical History Prior to Approval of Long-Term Disability Benefits

10.    In early 2003, Plaintiff began experiencing neck, arm, and elbow pain. (Def. Ex. 2, pp. 261-64.)

11.    In May and June 2003, plaintiff was seen by Steven Stewart, M.D., a family practice physician, who diagnosed elbow strain. (Id. at 371-72.)

5

12.    On July 11, 2003, plaintiff was seen by Jon Hyman, M.D., an orthopedic surgeon. (Id. at 261-63.) X-rays of plaintiff's elbow were normal, and Dr. Hyman diagnosed lateral epicondylitis and recommended rest and splinting for two weeks. (Id. at 262.)

13.    On August 1, 2003, plaintiff reported increased elbow pain, bilateral shoulder pain, and neck pain. (Id. at 258-60.) Dr. Hyman diagnosed lateral epicondylitis of the elbow and a cervical strain. He also noted that Plaintiff's overall condition was "getting worse," and suggested that Plaintiff work with restrictions, including limited heavy gripping, limited repetitive gripping, twisting or squeezing, and limited rapid repetitive hand/wrist movement. (Id.)

14.    On August 11, 2003, plaintiff was seen by Anita Cone-Sullivan, M.D., also an orthopedic surgeon, complaining of neck and upper extremity pain, numbness, tingling, and right arm pain. (Id. at 255-57.)

15.    Based on a physical examination and x-rays of plaintiff's cervical spine, Dr. Sullivan diagnosed cervical radiculopathy, cervical

6

spondylosis, left carpal tunnel syndrome, and left lateral epicondylitis.  (Id.)

16.    On August 29, 2003, when plaintiff complained of neck and bilateral upper extremity pain, Dr. Sullivan recommended that she undergo an electromyogram and nerve conduction study (EMG/NCS) and a cervical MRI.  (Id. at 252-54.)

17.    After plaintiff "discussed not being able to attend work due to her . . . symptoms at this time," Dr. Sullivan placed her off work for two weeks.  (Id.)

18.    Plaintiff never returned to work for Coca-Cola after that office visit.  (Id. at 344-73.)

19.    On September 10, 2003, plaintiff had an MRI of the cervical spine, which was described as having "[t]echnically compromised axial gradient echo sequences due to patient motion artifact." (Id. at 359.)  Nevertheless, the MRI was interpreted to show a herniated disc at C4-5 on the right, with mild flattening of the cord at that level and impingement of the right C5 nerve root, and an

7

osteophyte at the C5-6 level, impinging both C6 nerve roots. (Id. at 359-60.)

20. On September 11 and 18, 2003, plaintiff saw Dr. Sullivan, who diagnosed cervical radiculopathy, left elbow lateral epicondylitis, cervical spondylosis, but noted that the electromyogram and nerve conduction studies were normal. (Id. at 250-51, 248-49.) Dr. Sullivan reported that Plaintiff should remain on leave for two months, but "[a]nticipate[d] reassessing this in the future and possibly returning her to work at least with restrictions" prior to the end of the two-month period. (Id. at 249.) Dr. Sullivan also recommended a series of three epidural steroid injections and physical therapy. (Id.)

21. Plaintiff attended physical therapy for approximately four weeks, but discontinued it on the grounds that it exacerbated her symptoms. (Id.) Plaintiff did not obtain the epidural steroid injections.

22. On October 3, 2003, Plaintiff saw Dr. Stewart, complaining of pain and numbness in her neck, arm, and shoulder. (Id. at 355.) Dr.

8

AO 72A
(Rev.8/82)

Stewart recommended that plaintiff see an orthopedist and get an MRI of her elbow. (Id.)

23. Plaintiff continued to see Dr. Stewart approximately once every two months until at least August 2004, although his office notes are largely illegible. (Id. at 238-39, 308-09, 347, 349-50, 355-57.)

24. On October 14, 2003, plaintiff had an MRI of the left elbow, which showed subtle abnormal signal stimulation to the common extensor tendon, and mild lateral epicondylitis. (Id. at 356-57.)

25. On November 6, 2003, plaintiff saw Howard Levy, M.D., of The Emory Spine Center, who diagnosed cervical radiculopathy, and recommended that plaintiff consult a surgeon. (Id. at 291-92.) Dr. Levy noted that plaintiff was scheduled for a surgical consult with John G. Heller, M.D., in January 2004 and that she should remain out of work until then. (Id. at 351.)

26. On January 20, 2004, plaintiff was seen by Dr. Heller, who noted that the MRI in September 2003 was of poor quality and that "[t]he best one can glean is that she has mild multilevel spondylosis in the cervical spine with a fairly spacious cervical spinal canal." (Id.

9

at 285-87.)  Dr. Heller also noted that without specific, identifiable compression of plaintiff's spinal cord or nerve root, he would "have a hard time explaining this collection of symptoms and this level of dysfunction based upon a cervical spine injury."  (Id.)

27.   Dr. Heller said that the MRI findings were not entirely consistent with his findings on physical examination, and he recommended that plaintiff undergo a cervical myelogram and CT scan to determine whether there was any compression of her spinal cord. (Id.)

**B.   Plaintiff's February 2004 Claim is Approved**

28.   On February 10, 2004, Plaintiff filed a claim for long-term disability benefits with Liberty, stating that she had become disabled due to problems with her back, neck, and upper extremities; had been unable to work since August 29, 2003; and had exhausted her short-term disability benefits.[2]

---

[2] The Plaintiff's exhaustion of short-term disability benefits was a prerequisite to her eligibility for long-term disability

10

29.    In support of her claim, Plaintiff produced her medical records, including an Attending Physician Statement of Dr. Stewart, her treating physician, and the reports of the doctors described above. (Id. at 344-73, 423.)  Plaintiff reported that she had "reocurring [sic] neck stiffness"" for which she was first treated on July 11, 2003.  (Id. at 423.)

30.    In the Attending Physician Statement, dated February 4, 2004, Dr. Stewart reported that plaintiff had been diagnosed with cervical spine radiculopathy and carpal tunnel syndrome.  He opined that Plaintiff "will likely remain in pain for a prolonged period," but estimated that Plaintiff would be able to return to work within three to six months.  (Id. at 345-46.)

31.    In addition to Plaintiff's medical reports, Liberty received the Physical Job Evaluation Form from Coca-Cola describing Plaintiff's occupational duties as full-time sedentary work.  (See id. at 339, 330-32.)

32.    Liberty also requested a Physical Capacities report from Dr. Stewart, but had not yet received it at the time it made its decision

11

on Plaintiff's claim.

33.    On April 14, 2004, based on the above-described medical reports, Dr. Stewart's Attending Physician Statement, and the Physical Job Evaluation Form, Liberty approved Plaintiff's claim for disability benefits and retroactively applied her benefits to March 5, 2004, the day after her short-term benefits ended.  (Id. at 301.)

**C.    Liberty Reevaluates Plaintiff's File**

34.    On April 15, 2004, a day after Liberty granted Plaintiff's request for benefits, Dr. Stewart responded to Liberty's request by providing a Physical Capacities Form.  In the form, Dr. Stewart stated that, "[d]ue to patients severe chronic pain this patient is 100% disabled."  (Id. at 298.)  Dr. Stewart also stated, however, that Plaintiff could sit for four hours with hourly breaks, stand for two hours with hourly breaks, walk for two hours with 30 minute breaks, and reach below shoulder level for one hour daily.  (Id.)

35.    On May 12, 2004, Liberty Life's medical consultant concluded that plaintiff's medical records supported her diagnosis of cervical

12

AO 72A
(Rev.8/82)

radiculopathy and that her medical care had been appropriate. (Id. at 281.)

36. In October 2004, Liberty reviewed Plaintiff's medical records to determine Plaintiff's continuing eligibility. Susan McCormack, a Liberty nurse, reviewed Plaintiff's file and noted that her medical records gave certain indications that her condition was improving and she was capable of some work. She also noted that it did not appear that Plaintiff had acted upon the recommendations of her doctors. Nurse McCormack observed, for example, that "[t]here is no evidence that [Plaintiff] had the CT myelogram as recommended by Dr. Heller, . . . no evidence any additional diagnostic testing was obtained[, and n]o evidence of epidural steroid [injection] or additional [physical therapy]." Ms. McCormack concluded that a "[p]otential for increased activity is present." (Id. at 20-21.)

37. On November 18, Plaintiff had an electromyographic/nerve conduction ("EMG/NC") study performed by Dr. Jacquelyn Washington. Based on the results of the test, Dr. Washington

13

concluded that Plaintiff had "severe" bilateral cervical radiculopathy. (Pl.'s Ex. 17.) In her report, Dr. Washington noted that the electromyography "was remarkable for evidence of spontaneous activity and chronic denervation/reinnervation noted in the left deltoid, biceps, and infraspinatus. (Id.) Spontaneous activity was seen in upper and middle cervical paraspinal muscles bilaterally." (Id.) While not opining on Plaintiff's capacity to work, Dr. Washington concluded that "[t]his is an abnormal study. . . . The findings are severe[,] and consistent with both ongoing active as well as chronic denervation. Diagnostic considerations include cervical spondylosis and multilevel disc disease." (Id.)

38. On December 21, Dr. Washington again met with Plaintiff, and reported that "the patient continues to be symptomatic with evidence of upper motor neuron and lower motor neuron weakness." (Id. at 279.) Dr. Washington concluded, in a letter sent to Plaintiff's family physician, Dr. Stewart, that "[s]urgical consultation is likely to be required," but "[c]ontinue conservative management until then. . . ." (Id.)

14

**D.   Independent Medical Examination and Termination of Benefits**

39.   In November 2004, Liberty requested that Plaintiff attend an "independent medical evaluation" ("IME"). Plaintiff agreed, and on December 13, 2004, Plaintiff was examined by Dr. Ralph D'Auria, an orthopedic surgeon. (Def. Ex. 2 at 205-11.)

40.   Dr. D'Auria spent approximately fifteen minutes examining Plaintiff. Dr. D'Auria also reviewed Plaintiff's medical records, including the reports of Plaintiff's prior visitations to the doctors discussed above, the results of the 9/10/03 cervical MRI scan, Dr. Stewart's Physical Capacities Form, and the results of Dr. Washington's EMG/NC study. (Id. at 207-08.)

41.   In his report, Dr. D'Auria concluded that Plaintiff had "mild cervical radiculopathy, which has been improving over time with the procedures performed and the medical care that she has received. Based on the findings on the physical examination, the radicolopathy is continuing to improve clinically; as indicated by the reflexes, the appearance of the muscles, the muscular strength, and other objective findings." (Id. at 208.) Dr. D'Auria further

15

noted that all of Plaintiff's specialists agreed that Plaintiff's condition was "nonsurgical," but that, because "[s]he has received all the necessary treatment for her condition, which has been performed by qualified physicians," there is no specific treatment that would enable Plaintiff to return to normal functioning. (Id.)

41.    Dr. D'Auria also stated, however, that "claimant should be able to perform her job, which is sedentary in nature, with [restrictions on heavy lifting and overhead pushing and pulling]. Upon returning to work after being inactive for a long period of time, some degree of discomfort and initial mild pain should be expected. However . . . this should resolve with time." (Id.) He opined that, within 3 to 4 months, Plaintiff "should regain her normal strength and normal function," and thus the need for restrictions on her ability to work would eventually subside. (Id.)

42.    In his report, Dr. D'Auria noted "a significant degree of embellishment of symptoms during the physical examination." Plaintiff "seemed to be more focused on the pain process than on trying to perform in a functional manner. She complained of pain

16

constantly during the examination, even upon light touch, and displayed exaggerated pain behavior throughout.  This behavior is very typical of non-physiological overlay that is out of context with the objective findings." (Id. at 210.)  He further noted that "[m]any of her limitations appear to be self-imposed due to a fear of performing any movements or any activity.  This fear should be alleviated by returning to work in an environment where her attention is not concentrated on pain behavior, but rather on creative and productive activities." (Id. at 210.)

43.    In his report, Dr. D'Auria also noted that "[t]he total time spent interviewing and examining the claimant, as well as reviewing her medical records was approximately 2.5 to 3 hours." (Id. at 211.)

44.    On January 11, 2005, Liberty wrote to Dr. Stewart, asking whether he agreed with the findings of Dr. D'Auria, and, if he did not, to explain the reasons for his disagreement.  The letter requested Dr. Stewart's response by February 1, and stated that, in the absence of a response, Liberty would presume that Dr. Stewart was in agreement with Dr. D'Auria. (Id. at 202-04.)

17

45.    On February 3, 2005, after not receiving a response from Dr. Stewart, Liberty wrote to Plaintiff informing her of its decision to terminate Plaintiff's disability benefits.  Liberty stated that it concluded that Plaintiff was able to perform full-time sedentary work based upon the opinion of Dr. D'Auria and the lack of response from Dr. Stewart.  (Id. at 198-200.)

**E.    Appeal of Termination**

46.    On February 7, 2005, Plaintiff contacted Liberty and stated that she wished to appeal Liberty's decision to terminate her benefits.  In a faxed letter, Plaintiff suggested that it did not appear from Dr. D'Auria's analysis that he had considered the results of the EMG/NC study performed by Dr. Washington or the opinion of Dr. Stewart.  Plaintiff included a letter from Dr. Stewart dated the same day, which stated that Plaintiff was "permanently and totally disabled due to chronic, severe, neuropathic pain from her cervical spine."  (Id. at 181; Pl. Ex. 8.)

18

47. Liberty forwarded the EMG/NC report and Dr. Stewart's letter to Dr. D'Auria and asked whether this information affected Dr. D'Auria's conclusions.

48. On February 11, 2005, Dr. D'Auria wrote to Liberty, stating that he had "concerns" about the EMG report because it contained no "graphs supporting the assertions issued in Dr. Washington's EMG report." (Id. at 171.)  Because such graphs "are usually recorded so that another electromyographer can review the raw data and issue any conclusions based upon objective evidence," and because Dr. D'Auria didn't have the benefit of that raw data, Dr. D'Auria was "unable to issue an opinion regarding the testing without these graphs."  (Id.)

49. Dr. D'Auria further stated:  "Also, whereas I agree that the patient is somewhat disabled, the extent of the disability is still unknown. A functional capacity evaluation is needed as an objective way to accurately measure her functional abilities and disabilities, since embellishment and magnification of symptoms contaminate any potential positive findings on the physical examination."  (Id.)

19

50.     Dr. D'Auria concluded that "[his] initial impression remains unchanged," but recommended that "a functional capacity evaluation be performed in order to determine the patient's true degree of disability."  (Id.)

51.     On February 16, Liberty sent Dr. Stewart a letter requesting the raw data underlying Dr. Washington's EMG report.  In the letter, Liberty stated that, "[d]ue to conflicting medical opinion regarding the interpretation of the study, please send a copy of all relevant raw data for our review, as we are unable to make a determination regarding further benefit eligibility until this is clarified."  (Id. at 166.)

52.     In a letter dated February 18, Liberty wrote to Plaintiff to let her know that Liberty had "reopened [Plaintiff's] claim until a final determination regarding [her] eligibility is determined, pending review of the raw data from the EMG/NCS results."  (Id. at 165.) Plaintiff's benefits were then reinstated, and Plaintiff was sent a check for the period of February 4 through March 3, 2005.

20

AO 72A
(Rev.8/82)

53.    On February 24, pursuant to Dr. D'Auria's recommendation, Liberty scheduled a functional capacity evaluation to take place and wrote Plaintiff to this effect.  (Id. at 161-62.)

54.    On March 4, Plaintiff faxed Liberty a letter, indicating her refusal to participate in a functional capacity evaluation.  The letter stated as follows:

> Since the onset of my disability I have seen eight (8) physicians including; [sic] (7) Specialist, (1) Independent Medical Examination (IME) requested by Liberty on December 13, 2004, and several Company physicians (Hyman, Cone-Sullivan, Levy, and Heller.)
>
> During the IME you requested, my right to medical privacy was violated, and I was treated harshly.  While in my gown and barefoot, I was led to a waiting area with a tile floor.  The doors were opened wide on a day that was cold enough for a coat (12/13/2004).  My medical diagnosis and history was discussed in a waiting area where patients and other staff could hear.
>
> I have complied with all requirements necessary to determine my claim, and the severity of my disability.  Therefore, I decline to agree with you request for a second medical examination.

21

AO 72A
(Rev.8/82)

> Please do not schedule any additional
> testing/evaluations.  My only request is to be
> treated fair.

(Id. at 139.)

55.    On March 7, Liberty responded to Plaintiff's March 4th letter, stating that it would suspend Plaintiff's benefits based on its original decision unless Plaintiff attended a functional capacity evaluation.  (Id. at 155-56.)  Liberty's letter stated:

> At this time we are writing to advise you we
> will reschedule the FCE for you should you
> reconsider.  However, your benefit is suspended
> pending your attending a rescheduled FCE.  If
> you decide you will not attend a rescheduled
> FCE, then your claim will be closed based on
> the original IME results.
>
> We considered the [EMG] testing in the
> absence of the raw data from the EMG/NCS
> testing done by Dr. Washington, due to your
> doctor being in disagreement.  However, since
> your doctor will not provide us with the raw
> data for review, and you will not attend an FCE,
> then we will maintain our original decision
> based on the IME results from Dr. D'Auria.

(Id.)

22

AO 72A
(Rev.8/82)

56.    At the close of the letter, Liberty reminded Plaintiff of the language in its disability policy requiring Plaintiff to be "examined or evaluated at reasonable intervals deemed necessary by Liberty. . . as often as reasonably required."  (Id.)

57.    Sometime thereafter, Dr. Stewart sent Liberty the raw data of the EMG performed by Dr. Washington.

58.    On March 18, Dr. D'Auria reviewed the raw data of the EMG report and took issue with Dr. Washington's findings and the sufficiency of the report.  (Id. at 124.)  In an addendum to his original report, Dr. D'Auria requested further clarification of the "evidence of spontaneous [muscle] activity" by Dr. Washington, and noted that "the report does not indicate the basis for the findings of denervation/reinnervation."  (Id.)

59.    Dr. D'Auria further stated that, in the absence of this data, he was "not able to correlate the findings obtained on my physical examination with [the conclusions] of Dr. Washington . . . especially with no details regarding the actual findings; no descriptions of the behavior of the muscles under voluntary

23

contraction, minimal contraction, and maximum contraction; and no indication of the type of spontaneous activity." (Id.)

60. Therefore, he concluded that his "original recommendations remain unchanged [because this] additional evidence does not support an inability of Ms. Everson to perform full time sedentary activities." (Id.)

61. After receiving this report, Liberty wrote to Dr. Washington on March 23 in an attempt to clarify the basis for her findings. In the letter, Liberty repeated the requests of Dr. D'Auria for details as to the specific muscle activity that Dr. Washington found.

62. Thereafter, Dr. Washington returned Liberty's letter, and in a handwritten note in the margin, stated: "description of muscles is on the original report." (Id. at 123.) On March 25, Dr. D'Auria completed another report in which he concluded that Dr. Washington's note "does not provide any additional medical information . . . [and] does not support the inability of the claimant to perform full time sedentary duties." (Id. at 119.)

24

AO 72A
(Rev.8/82)

63. On March 29, Liberty wrote to Plaintiff, stating that it had decided to uphold its original decision suspending Plaintiff's benefits and advising her of her right to appeal. (Id. at 109.)

64. On April 1, Plaintiff phoned Liberty to request an appeal. (Id. at 97.) Liberty rejected her appeal on April 8, 2005, but stated that it would retroactively extend her benefits through March 28, 2005, the date when Liberty appeared to make its final decision regarding Plaintiff's eligibility.[3]

## F. Conflict of Interest

65. In the present case, the parties agree that Liberty, at the time it terminated Plaintiff's benefits, was both vested with discretion

---

[3] Liberty also notified Plaintiff that she had exhausted her administrative remedies. Approximately 4 months later, on July 25, 2005, Dr. Stewart again wrote to Liberty, stating that Plaintiff's "condition has progressively deteriorated since 2003 to the point where she has been rendered totally disabled . . . . Due to the severity of her condition I have not released Mrs. Everson to return to work since her disability onset in 2003." (Pl.'s Ex. B to Mot. for Summ. J. [15-3] at 331.) Dr. Stewart also attached the reports of Dr. David Gower and Dr. Jacqueline Washington. However, because these reports were sent after Plaintiff had exhausted her appeal with Liberty, they were not part of the administrative record considered by Liberty in evaluating her eligibility, and thus should not be considered by this Court. See Parness v. Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2003).

25

under the plan and suffered from a conflict-of-interest because it paid benefits out of its own funds.

66.   Liberty's employees who make decisions regarding the claims of ERISA plan participants are paid fixed salaries not based upon the number of claims paid or denied.  (Testimony of Charles Johnson.)

67.   Liberty does not establish numerical guidelines or quotas regarding claim payments or denials.  (Id.)

68.   Liberty does not act in a manner to overtly discourage the payment of claims and employs the same procedures for claims that it administers regardless of whether it is paying claims out of its own funds or the funds of another party.  (Id.)

69.   Plaintiff introduced no evidence outside of the administrative record, such as historical data concerning Liberty's claims denial rate, that would be relevant in determining the weight of the conflict of interest.

### Conclusions of Law

**I.   ERISA Framework**

1.   Plaintiff's claims arise under section 502 of the Employee

26

Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).

2.   In the present case, the parties agree and the Court finds that Liberty, at the time it terminated Plaintiff's benefits, was both vested with discretion under the plan and suffered from a conflict-of-interest.

3.   ERISA is silent regarding the standard of review applicable to an administrator's benefits determination.  However, the Eleventh Circuit has recently clarified that an arbitrary-and-capricious standard applies to a challenge of a decision to deny benefits where the claims administrator is vested with discretion.  See Doyle v. Liberty Life Assurance Co. of Boston, 542 F.3d 1352, 1360 (11th Cir. 2008).

4.   The Eleventh Circuit also clarified that the burden of proof remains at all times with the plaintiff, and the existence of a conflict of interest should merely be considered a factor in the determination of arbitrariness and capriciousness.  Id.  In Doyle, the court explained as follows:

27

AO 72A
(Rev.8/82)

> We continue to adhere to [the principle] that reviewing courts must consider an administrator's conflict of interest in deciding whether the decision to deny benefits was arbitrary.  But we hold that [Metropolitan Life Ins. v. Glenn, 128 S. Ct. 2343 (2008)] implicitly overrules our precedent to the extent it requires district courts to review benefit determinations by a conflicted administrator under the heightened standard.  We hold that the existence of a conflict of interest should merely be a factor for the district court to take into account when determining whether an administrator's decision was arbitrary and capricious.  And we hold that, while the reviewing court must take into account an administrative conflict when determining whether an administrator's decision was arbitrary and capricious, the burden remains on the plaintiff to show the decision was arbitrary; it is not the defendant's burden to prove its decision was not tainted by self-interest.

Id. at 1360.

5.    As a result of the Supreme Court's decision in Glenn and the Eleventh Circuit Court of Appeals' decision in Doyle, this Court's sole inquiry is whether Plaintiff has demonstrated by a preponderance of the evidence that Defendant's decision to deny benefits was arbitrary and capricious.

6.    "[A]n abuse of discretion or arbitrary and capricious standard means that the reviewing court will affirm merely if the

28

administrator's decision is reasonable given the available evidence, even though the reviewing court might not have made the same decision if it had been the original decision-maker.'"" Callough v. E.I. du Pont de Nemours & Co., 941 F. Supp. 1223, 1228 n.3 (N.D. Ga. 1996); see also Carr v. The Gates Health Plan, 195 F.3d 292, 294 (7th Cir. 1999) ("Under the arbitrary and capricious standard, it is not [the Court's] function to decide whether [it] would reach the same conclusion as the Plan or even rely on the same authority."). As a result, this Court is "limited to determining whether [Liberty Life's decision] was made rationally and in good faith – not whether it was right.'"" Griffis v. Delta Family-Care Disability, 723 F.2d 822, 825 (11th Cir. 1984).

7.    The Court's review of the merits of the administrator's decision is limited to the administrative record. Parness v. Metro. Life Ins. Co., 291 F. Supp. 2d 1347, 1356-57 (S.D. Fla. 2003).

## II.    Resolution of Plaintiff's Claim

8.    After full review and consideration of all the evidence in the administrative record, the Court concludes that Plaintiff has not

29

AO 72A
(Rev.8/82)

demonstrated by a preponderance of the evidence that Liberty's discretionary decision to deny benefits was arbitrary and capricious. Although this Court would not have arrived at the same decision as Liberty, several reasons convince this Court that Liberty's decision that Plaintiff was not "disabled" from performing full-time sedentary work was not unreasonable.

9.   First, the independent medical evaluation of orthopaedic surgeon Dr. D'Auria, which was based upon a personal visit with Plaintiff and a full review of Plaintiff's medical records, concluded that, at the time the benefits decision was made, Plaintiff was capable of performing full-time sedentary work. The report also observed that Plaintiff may have been embellishing the level of her pain. Although the report's characterization of Plaintiff's injury as "mild" is in conflict with the observations of Dr. Washington and Dr. Stewart, its conclusion is based upon a complete medical analysis of Plaintiff's physical capabilities and pain tolerance. The Court cannot say that it was unreasonable for Liberty to have placed weight on the medical opinion of Dr. D'Auria, a board-

30

AO 72A
(Rev.8/82)

certified orthopaedic surgeon, in reaching its conclusion that Plaintiff was not "disabled" under the terms of the Plan.

10.    Second, Dr. Heller's observations in January 2004 lend support to both Dr. D'Auria's evaluation and Liberty's conclusion that Plaintiff was not "disabled." In his report, Dr. Heller noted that he encountered difficulty in analyzing Plaintiff's condition because "variable effort was manifested grading the motor groups in the upper extremities." (Def's Ex. 2, p. 286.) He also questioned the physical evidence of Plaintiff's pain, noting that "absent, [sic] specific, identifiable compression of either her spinal cord or nerve root, I would have a hard time explaining this collection of symptoms and this level of dysfunction based upon a cervical spine injury." (Id.) Dr. Heller's observation of Plaintiff's variable effort and the zeal with which she described her pain is consistent with Dr. D'Auria's observations; it also gives reason for a claims administrator to believe that the severity of Plaintiff's pain and inability to work was being overstated.

31

AO 72A
(Rev.8/82)

11.    Third, Plaintiff refused to attend the functional capacity evaluation requested by Liberty.  Plaintiff was obligated under the Plan to provide proof of continuing disability and to honor Liberty's requests to be independently evaluated by other physicians. Compare Doyle, 542 F.3d at 1352 ("The burden fell on Doyle to establish that she was entitled to LTD benefits.").  In this regard, the Plan provided that Liberty could terminate benefits on "the date the Covered Person refuses to be examined or evaluated at reasonable intervals."  Although Plaintiff provided as the reason for her refusal the degrading experience of attending the IME with Dr. D'Auria, it was not unreasonable for Liberty to request such an evaluation and to consider Plaintiff's refusal to attend the functional capacity evaluation in denying her disability benefits. Dr. D'Auria recommended that Plaintiff attend such an evaluation. Moreover, the conflicting medical opinions of Dr. Stewart and Dr. D'Auria and the limited data concerning Plaintiff's functional capacity provided good reason for Liberty to make such a request. In view of Plaintiff's obligation under the Plan, and in view of the

32

conflicting medical evidence, Plaintiff's refusal to participate in the functional capacity evaluation provides further evidence that Liberty's termination of Plaintiff's benefits was not unreasonable. Cf. Porter v. Provident Life and Accident Ins. Co., 2006 WL 249541 (11th Cir. Feb. 2, 2006) (unpublished) (holding that plaintiff's failure to attend independent medical evaluation as required in disability plan constituted an independent ground for termination of plaintiff's benefits and thus summary judgment in favor of defendant was proper).[4]

---

[4] Notably, Liberty does not argue that Plaintiff's refusal to attend a functional capacity evaluation *alone* constituted an independent basis to terminate Plaintiff's benefits. See Porter, 2006 WL 249541 at *1. In Porter, the Eleventh Circuit held that a benefits provider had an adequate and independent justification to terminate the plaintiff's disability benefits based on the plaintiff's refusal to submit to an independent medical evaluation. Id. There, the insurer's original decision was based on disputed medical opinions regarding the plaintiff's condition. However, on the plaintiff's sixth appeal of the provider's decision, the provider offered the plaintiff the opportunity to submit to an independent medical evaluation. After the plaintiff refused, the provider denied her appeal, "reasoning that her failure to submit to an independent medical evaluation was a failure to comply with her obligations under the long term plan and establishes a new justification for disability benefits." Id.

Here, like in Porter, Liberty offered Plaintiff an opportunity to participate in an independent evaluation and pointed out in its March 7th letter to Plaintiff that Plaintiff had an obligation to reasonably participate in such evaluations at Liberty's request. (Def.'s Ex. 2, pp. 155-56.) Liberty's letter also provided, however, that should Plaintiff choose not to attend a functional capacity evaluation, "your claim will be closed based on the original IME results." (Id.) After noting the disagreement between Drs. Stewart

33

12.    Fourth, although Plaintiff relies heavily on the conclusion of her family doctor, Dr. Stewart, that she was "disabled" under the meaning of the Plan, the record does not make clear the medical basis for Dr. Stewart's evaluation or the course of treatment pursued by Dr. Stewart. Rather, it appears that in addition to his own evaluations, Dr. Stewart relied upon the subjective reports of pain by Plaintiff and the medical reports of the specialists Plaintiff

---

and D'Auria and the need for an independent evaluation, Liberty repeated that it would "maintain [its] original decision based on the IME results from Dr. D'Auria" if Plaintiff refused to submit to the functional capacity evaluation. (Id.)

    Because of the specific language of Liberty's letter, this case is arguably distinguishable from Porter. Here, Liberty did not offer Plaintiff's refusal to comply with its request for an independent evaluation as an independent justification for its initial termination of benefits or in its decision on appeal. Indeed, Liberty did not state in its letter of March 7 or any time afterwards that Plaintiff's refusal to participate was the reason (or one of the reasons) underlying Liberty's decision to terminate. Rather, Liberty indicated to Plaintiff that it would "maintain" the reasoning of its "original decision based on the IME results from Dr. D'Auria" should Plaintiff refuse to participate in the functional capacity evaluation. (Id.)

    Nonetheless, because Liberty has not raised this issue as an independent basis for termination of Plaintiff's benefits, and because the Court finds that this evidence provides limited value in determining the reliability of the evidence upon which Liberty relied in making its decision, this Court need not decide the difficult issue of whether an insurance provider can offer what appears in this case to be a *post hoc* independent justification for termination based on a insured's refusal to submit to an independent examination. See Grayer v. Liberty Life Assur. Co. of Boston, 144 Fed. App'x 760, 761 n.1 (11th Cir. 2005) (declining to address similar issue and stating that "we do not decide whether district courts are limited to determining whether the reasons proffered by an ERISA plan administrator are the only reasons district courts can consider on appeal").

34

visited in formulating his own opinion of the nature of Plaintiff's disability.  But notably, no other specialist opined as did Dr. Stewart that Plaintiff was totally and permanently disabled.  In light of the absence of affirmative opinions by other doctors as to Plaintiff's continuing inability to work on a full-time sedentary basis, and in light of the fact that Dr. D'Auria is a board-certified orthopaedic surgeon with more specialized training than Dr. Stewart, Plaintiff's family medicine doctor, the Court cannot say that Liberty's decision to afford Dr. D'Auria's opinion more weight than Dr. Stewart's opinion was unreasonable.  See Black & Decker Disability Plan v. Nord, 538 U.S. 822, 825 & 834, 123 S. Ct. 1965, 155 L. Ed. 2d 1034 (2003) (stating that "plan administrators are not obliged to accord special deference to the opinions of treating physicians," and that courts may not "impose on plan administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation").

35

AO 72A
(Rev.8/82)

13. Fifth, despite the recommendation of Dr. Sullivan to obtain steroid injections and the recommendation of Dr. Heller to obtain a CT scan, it does not appear that Plaintiff pursued these avenues of diagnosis and treatment. Nor did Plaintiff ever attempt to return to work after she started receiving temporary benefits beginning in August of 2003. These are additional facts which Liberty may have reasonably considered in its benefits determination. Tippitt v. Reliance Standard Life Ins. Co., 276 F. App'x 912, at *3 (11th Cir. Apr. 29, 2008) (noting that it can be appropriate to consider *post hoc* explanations offered by the insurer about why claim was denied).

14. Finally, Liberty's repeated efforts to obtain more information from Plaintiff's diagnosing physicians after Plaintiff appealed its benefits decision demonstrates that Liberty "took steps to promote accurate claim assessment," and tends to discount the effect of the conflict of interest of which the Court must take account in this action. See Doyle, 542 F.3d at 1362 (suggesting that conflict of interest is of "little significance" where administrator shows that it

36

has endeavored to promote accurate claims determination). Moreover, Liberty's decision to reinstate Plaintiff's benefits on multiple occasions during the pendency of her administrative appeal—which ultimately compensated Plaintiff for 13 of 24 months of her "own occupation" disability benefit until the final resolution of her appeal—weighs against finding that Liberty acted arbitrarily and capriciously in its decision. Id.

15. Plaintiff contends, citing Glenn, that Liberty failed to weigh the effect of the Social Security Administration's decision to award her disability payments. At trial, Plaintiff stated during oral argument that the Social Security Administration awarded her such payments in 2005 and retroactively compensated her for her disability in the years 2003 and 2004. However, unlike in Glenn, no evidence of the Social Security Administration's decision was included within the administrative record in this case because Plaintiff had already exhausted her administrative remedies prior to

37

the Social Security Administration's decision.[5]  Accordingly, it was not unreasonable for Liberty to fail to reconcile the determination of the Social Security Administration with its own determination because, at the time the Social Security Administration's determination was made, the administrative process had been closed.  See Parness, 291 F. Supp. 2d at 1356-57 (review of benefits decision is limited to evidence present before the administrator at the time of the decision).

16.  Plaintiff also contends that Liberty failed to weigh the opinions of its own medical record examiners which led it to initially approve her disability claim in April 2004.  Two examiners concluded that plaintiff's medical records supported her diagnosis of cervical radiculopathy and that her medical care and disability award had been appropriate.  However, it was not unreasonable for Liberty to reexamine the basis for its original decision to deny benefits and to afford more weight to the opinions of the doctors who examined

---

[5]Although it is perhaps beside the point, the Court also notes that no evidence of the Social Security Administration's award was introduced at trial.

38

Plaintiff than its own consultants who examined only Plaintiff's records. As was the case in Doyle, the Plan in this case "permits Liberty Life to terminate benefits unless the plan participant proves that she satisfies the [disability] definition. Liberty Life had no obligation to explain . . . how [Plaintiff's] condition had changed" from the time it had decided to award benefits to the time it decided to terminate benefits. Doyle, 542, F.3d at 1362. Rather, "[t]he burden fell on [Plaintiff] to establish that she was entitled to LTD benefits." Id.

17. Plaintiff also contends that the conflict of interest that Liberty suffers combined with the medical evidence which supports a finding of disability in this case entitles her to judgment. As discussed above, the Court is obligated to consider Liberty's conflict of interest as a factor in determining whether Liberty acted arbitrarily and capriciously in denying Plaintiff disability benefits. Glenn, 128 S. Ct. 2343; Doyle, 542 F.3d at 1360. Although considering Liberty's conflict of interest in the context of the substantial medical evidence of Plaintiff's disability renders this a

39

AO 72A
(Rev.8/82)

close case, Plaintiff has not offered any additional evidence besides the mere existence of the conflict that would indicate that Liberty's conflict of interest undermined its ability to fairly discharge its duties under the Plan. For example, "[t]here is no evidence showing that Liberty Life was influenced by the conflict," such as "'a history of biased claims administration.'" Doyle, 542, F.3d at 1363 (quoting Glenn, 128 S. Ct. 2351). To the contrary, Liberty's repeated efforts to investigate Plaintiff's claim and decision to reinstate Plaintiff's benefits during the course of her appeal mitigates the effect of the conflict of interest in the Court's consideration. Id. (stating that absent evidence that the conflict of interest adversely affected the administrator's decision, "the conflict should have [] little weight in the district court's analysis"). In short, in the context of all of the evidence in this case, the Court cannot conclude that the conflict of interest tips the scale in favor of finding that Liberty's decision to deny benefits was arbitrary and capricious.

40

17.     In sum, based upon (1) the opinion of Dr. D'Auria that Plaintiff was not disabled and had embellished her symptoms; (2) the report of Dr. Heller that he could not form an opinion as a result of Plaintiff's embellishment of systems; (3) Plaintiff's refusal to attend a functional capacity evaluation at the request of Liberty; (4) the apparent absence of any affirmative course of treatment or medical corroboration of Dr. Stewart's opinion concerning Plaintiff's disability; (5) Plaintiff's apparent failure to follow certain treatment recommendations of the specialists she visited; and (6) Liberty's conduct during the course of Plaintiff's appeal including thorough investigation and voluntary reinstatement of Plaintiff's benefits until the final resolution of her appeal, the Court concludes that Liberty's decision to terminate Plaintiff's benefits was not arbitrary and capricious.

18.     Accordingly, Liberty is entitled to judgment in this action.

### Conclusion

Based on the foregoing, the Court finds in favor of Defendant and against Plaintiff in this action.  The Clerk is **DIRECTED** to **ENTER JUDGMENT** in

favor of Defendant and against Plaintiff.

      **SO ORDERED** this __2nd__ day of January, 2009.

RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

42

AO 72A
(Rev.8/82)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

JACQUELINE EVERSON,

                Plaintiff,

vs.

LIBERTY MUTUAL ASSURANCE
COMPANY,

                Defendant.

CIVIL ACTION FILE

NO. 1:05-cv-2459-RWS

**J U D G M E N T**

This action having come before the Court, Honorable Richard W. Story, United States District Judge, for a bench trial, and the Court having entered its Findings of Fact and Conclusions of Law finding in favor of the Defendant and against the Plaintiff, it is

**Ordered and Adjudged** that the Plaintiff take nothing; that the Defendant recover its costs of action, and the action be, and the same hereby is, **dismissed**.

Dated at Atlanta, Georgia, this 2nd day of January, 2009.

                JAMES N. HATTEN
                CLERK OF COURT


                By:   s/ Denza F. Bankhead
                      Deputy Clerk

Prepared, Filed, and Entered
in the Clerk's Office
  January 2, 2009
James N. Hatten
Clerk of Court

By: s/ Denza F. Bankhead
      Deputy Clerk

EXHIBIT

**F**

# United States Court of Appeals
### Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

Thomas K. Kahn
Clerk

RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta
MAR 2 0 2009
JAMES N. HATTEN, Clerk
By: _____ Deputy Clerk

For rules and forms visit
www.ca11.uscourts.gov

March 19, 2009

James N. Hatten
Clerk, U.S. District Court
75 SPRING ST SW STE 2211
ATLANTA  GA  30303-3318

**Appeal Number: 09-10549-HH**
Case Style: Jacqueline Everson v. Liberty Mutual
District Court Number:  05-02459 CV-RWS-1


The enclosed certified copy of this Court's order dismissing the appeal for lack of jurisdiction is issued as the mandate of this court. See 11th Cir. R. 40-4 and 11th Cir. R. 41-4.

The district court clerk is requested to acknowledge receipt on the copy of this letter enclosed to the clerk.


Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Joe Caruso (404) 335-6177


Encl.


```
+---------------------+
|      EXHIBIT        |
|                     |
|  _____G_____    |
+---------------------+
```

DIS-4  (3-2005)

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT



No. 09-10549-H

**FILED**
**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**

MAR 19 2009

THOMAS K. KAHN
CLERK

JACQUELINE EVERSON,

Plaintiff-Appellant,

versus

LIBERTY MUTUAL ASSURANCE COMPANY,

Defendant-Appellee.

FILED IN CLERK'S OFFICE
U.S.D.C. Atlanta

MAR 20 2009

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

Appeal from the United States District Court for the
Northern District of Georgia

Before TJOFLAT, DUBINA, and BLACK, Circuit Judges.

BY THE COURT:

This appeal is DISMISSED, <u>sua sponte</u>, for lack of jurisdiction. Jaqueline Everson's February 3, 2009, notice of appeal, is untimely to appeal the district court's February 2, 2009, final judgment. <u>See</u> Fed.R.App.P. 4(a)(1)(A); <u>Rinaldo v. Corbett</u>, 256 F.3d 1276, 1278 (11th Cir. 2001).

No motion for reconsideration may be filed unless it complies with the timing and other requirements of 11th Cir.R. 40-4 and all other applicable rules.

A TRUE COPY - ATTESTED:
CLERK U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

By: _____
DEPUTY CLERK
ATLANTA, GEORGIA

# United States Court of Appeals
### Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia  30303

RECEIVED IN CLERK'S OFFICE
U.S.D.C. - Atlanta

OCT 2 2 2009

JAMES N. HATTEN, Clerk
By: Deputy Clerk

**Thomas K. Kahn**
Clerk

For rules and forms visit
www.ca11.uscourts.gov

October 21, 2009

James N. Hatten
Clerk, U.S. District Court
75 SPRING ST SW STE 2211
ATLANTA  GA  30303-3318

**Appeal Number: 09-10549-HH**
Case Style: Jacqueline Everson v. Liberty Mutual
District Court Number:  05-02459 CV-RWS-1

The Supreme Court has denied certiorari.  The court's mandate having previously issued, no further action will be taken by this court.

Sincerely,

THOMAS K. KAHN, Clerk

Reply To: Melanie Gaddis (404) 335-6187

c: District Court Judge

```
EXHIBIT

    H
```

MDT-4 (04-2007)